EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| In re: | 2007 TSPR 189 |
| Carlos Rivera Vicente | 172 DPR _____ |

Número del Caso: CP-2003-21

Fecha: 30 de octubre de 2007

Abogados de la Parte Querellada:

Lcda. Mónica I. De Jesús Santana
Lcda. Marta Quiñones Zambrana
Lcda. Lourdes María Torres Esteves
Lcdo. Pedro E. Ortiz Álvarez

Oficina del Procurador General:

Lcdo. Héctor Clemente Delgado
Procurador General Auxiliar

Lcda. Miriam Soto Contreras
Procuradora General Auxiliar

Lcdo. Salvador Antonetti Stutts
Procurador General

Lcda. Ana Garcés Camacho
Procuradora General Auxiliar

Lcda. Maite D. Oronoz Rodríguez
Subprocuradora General

Lcda. Mariana D. Negrón Vargas
Subprocuradora General

Materia: Conducta Profesional

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

INTEGRACIÓN DE SALA ESPECIAL

ORDEN

San Juan, Puerto Rico, a 30 de octubre de 2007.

Debido a la no intervención de los Jueces Asociados señores Rebollo López y Fuster Berlingeri, y a la inhibición de la Jueza Asociada señora Rodríguez Rodríguez, se constituye una Sala Especial integrada por el Juez Presidente señor Hernández Denton, el Juez Asociado señor Rivera Pérez y la Jueza Asociada señora Fiol Matta, para entender en el caso núm. CP-2003-21, In re: Carlos Rivera Vicente.

Lo decretó y firma.

Federico Hernández Denton
Juez Presidente

CERTIFICO:

Aida I. Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

*In re:*

Carlos Rivera Vicente          CP-2003-21   Conducta
                                            Profesional

Sala Especial integrada por el Juez Presidente señor Hernández Denton, el Juez Asociado señor Rivera Pérez y la Jueza Asociada señora Fiol Matta

PER CURIAM

San Juan, Puerto Rico a 30 de octubre de 2007.

El Procurador General presentó una querella en contra del Lcdo. Carlos Rivera Vicente (en adelante, Rivera Vicente) imputándole varias infracciones al Código de Ética Profesional. En síntesis, el Procurador General sostuvo que Rivera Vicente incurrió en conducta impropia al haber mostrado interés en obtener grandes beneficios a través de la creación de una entidad corporativa para la implantación de un plan creado por quien fuera su cliente, a saber, la Autoridad de Desperdicios Sólidos (en adelante, la Autoridad). Asimismo, alegó que Rivera Vicente violó el Canon 37 sobre participación del

abogado en negocios, al examinarlo en conjunto con el Canon 21 sobre el deber de lealtad hacia los clientes. Además, le imputó haber violado el Canon 18, el cual exige de los abogados un trato hacia los clientes que se caracterice por la mayor diligencia y capacidad. Finalmente, sostuvo que Rivera Vicente violó el Canon 38 al arrojar sospechas sobre sus motivaciones en la relación que mantenía con la Autoridad.

Luego de que Rivera Vicente sometiera su posición sobre las alegaciones presentadas, nombramos un Comisionado Especial para que presidiera la vista evidenciaria, aquilatara la prueba y nos preparara un informe en el cual recogiera sus determinaciones de hechos. Examinado el informe correspondiente, concluimos que Rivera Vicente no incurrió en las violaciones señaladas.

Los hechos, según expuestos a continuación, surgen mayormente de las determinaciones fácticas del Comisionado Especial.

I

Rivera Vicente es socio propietario del Bufete Cancio, Nadal, Rivera & Díaz (en adelante, el Bufete) con un 30% de participación en las acciones. El 1 de enero de 1994 el Bufete suscribió un contrato de servicios profesionales con la Autoridad. Antes de suscribir el referido contrato, Rivera Vicente había comenzado a diseñar una entidad mediante la cual pudiera participar del modelo de desarrollo económico establecido por la nueva

administración que entró en función a partir de las elecciones generales de noviembre de 1992. Dicho modelo de desarrollo económico pretendía, entre otras cosas, conferirle mayor participación a la empresa privada en funciones tradicionalmente ejercidas por el Gobierno.

Los desarrolladores de la idea pretendían ofrecer servicios multidisciplinarios mediante un consorcio, el cual estaría integrado por varias entidades, entre ellas, el Bufete. Originalmente se denominó "Integrated Services Partnership", I.S.P. pero eventualmente se incorporó bajo el nombre de "Puerto Rico Infraestrcuture Management Group, Inc., PRIME[1]" (en adelante, PRIME).

Más tarde, en marzo de 1995, la Autoridad adoptó lo que se denominó como el "Plan de la Infraestructura Regional para el Reciclaje y la Disposición de Desperdicios Sólidos" (en adelante, el Plan). Para la preparación del Plan, la Autoridad fue asesorada por consultores internos y externos, sin ingerencia alguna del Bufete. Antes de su adopción, la Autoridad difundió la propuesta entre los medios de comunicación, los municipios y Bibliotecas del País. Además, se celebraron vistas públicas en diversos pueblos de la Isla donde la ciudadanía tuvo la oportunidad de expresarse en cuanto a su contenido.

Una vez la Autoridad adoptó el Plan, y anticipando un posible aumento en la cantidad de trabajo legal, el Bufete comenzó a hacer gestiones para ampliar los servicios

---

[1] PRIME fue incorporada el 16 de octubre de 1998 por el Lcdo. Rubén Medina Lugo, miembro del Bufete.

profesionales que le proveía a la entidad. Además, a principios del año 1998, Rivera Vicente promocionó la idea de PRIME en el Gobierno. Eventualmente, el entonces Director Ejecutivo de la Autoridad, Ing. Daniel Pagán, mostró interés en el concepto para atender los problemas de los desperdicios sólidos en el país porque entendía que el Gobierno no tenía los recursos necesarios.

En septiembre de 1998, en ánimo de prepararse para la implantación del Plan, el Bufete y la Lcda. Marie Code, Directora de la División Legal de la Autoridad, prepararon un modelo de contrato que serviría para comenzar la relación entre la Autoridad y la entidad que se escogiera para dicha gestión. El Lcdo. Pedro Maldonado Ojeda, entonces socio del Bufete, participó en la preparación del referido modelo de contrato.

Más tarde, PRIME preparó para la Autoridad –a solicitud de ésta– una propuesta para la implantación del Plan. No obstante, la Autoridad le solicitó propuestas a otras entidades, entre ellas, E & M Group. y Rosser, a las cuales se les proveyó la misma información que se le ofreció a PRIME. Tras evaluar las propuestas sometidas, la Autoridad escogió a PRIME para hacerse cargo de la implantación del Plan. Cuando se tomó la decisión de contratar a PRIME, la Autoridad sabía de los intereses de Rivera Vicente en la transacción y de que éste era su principal accionista (con un 75% de las acciones) porque Rivera Vicente le había divulgado la información.

En vista de que PRIME había sido seleccionada para la implantación del Plan, ésta y la Autoridad comenzaron a elaborar un contrato que se conocería como "Management Assistance Service Agreement" (en adelante, el Contrato). Para la elaboración del referido Contrato, las partes partieron del modelo que había estado preparando la Autoridad, mas las negociaciones conllevaron la preparación de más de cuarenta (40) borradores.

Durante el proceso de preparación del Contrato, la Lcda. Code se mostró preocupada de que fuera Rivera Vicente quien negociara los términos y condiciones, toda vez que el Bufete era una de las entidades que componía PRIME y, por consiguiente, el mismo continuaría prestando servicios profesionales a favor de la Autoridad. Para atender la inquietud de la Lcda. Code, PRIME contrató al Lcdo. Carlos Ruiz Cox para que la representara durante la negociación, de manera que el Bufete no la asistiera durante esa etapa. La persona contacto entre el Lcdo. Ruiz Cox y PRIME sería el Lcdo. Pedro Santiago, Presidente de PRIME. Además, para evitar mayores preocupaciones, el Bufete optó por renunciar al contrato de servicios profesionales que tenía con la Autoridad. La renuncia se hizo por medio de una carta suscrita el 16 de noviembre de 1998 por Rivera Vicente en representación del Bufete.

Aproximadamente dos meses después, el 15 de enero de 1999, el Ing. Pagán autorizó el otorgamiento del contrato entre PRIME y la Autoridad para el desarrollo de los

proyectos incluidos en el Plan. Al acto de otorgamiento comparecieron el Ing. Pagán, en representación del Departamento de Recursos Naturales y Ambientales; la Ing. Longoria, en representación de la Autoridad y el Lcdo. Santiago, por parte de PRIME.

En el Contrato se acordó que la Autoridad autorizaba a PRIME a subcontratar a las entidades que componían el consorcio, entre ellas, al Bufete. Asimismo, se acordó que la facturación de las entidades subcontratadas se haría a través de PRIME. El contrato disponía, además, que PRIME y sus subcontratistas observarían completa lealtad hacia la Autoridad y hacia los principios que ésta promueve. De la misma forma, se dispuso que PRIME sería responsable por el cumplimiento de los trabajos subcontratados y que no se entendería que existe un contrato entre las entidades subcontratadas y la Autoridad.

Por otro lado, se acordó que en la subcontratación a ser realizada por PRIME se establecería que los subcontratistas estarían igualmente obligados al cumplimiento de las disposiciones del contrato entre PRIME y la Autoridad en cuanto aplicara a sus respectivos servicios. Asimismo, allí se certificó que PRIME no tenía ningún conflicto de interés o de política pública con la Autoridad. En atención a ello, el contrato proveía para el nombramiento de un Comité que se encargaría de velar por el cumplimiento de las disposiciones relacionadas a los conflictos de intereses.

Posteriormente, el 23 de marzo de 1999, se otorgó el contrato correspondiente entre PRIME y el Bufete como subcontratista y componente del consorcio. Al referido contrato se le dio efecto retroactivo al 19 de enero de 1999, día en que se suscribió el Contrato con la Autoridad. En el contrato suscrito entre PRIME y el Bufete también se acordó que el Bufete le brindaría lealtad a PRIME. Se acordó, además, que el Bufete nunca le ofrecería servicios legales a PRIME.

Más tarde, ocurrió un cambio de administración efectivo en enero de 2001, tras el cual la Autoridad canceló el Contrato suscrito con PRIME. Eso dio lugar a que PRIME presentara una demanda contra la Autoridad por incumplimiento de contrato ante el Tribunal de Primera Instancia, Sala Superior de San Juan. Cuando PRIME instó la referida demanda, la relación abogado-cliente entre el Bufete y la Autoridad había cesado diez (10) meses atrás y la representación legal de PRIME no la ostentó el Bufete.

El referido cambio de administración trajo consigo, además, la creación de un comité denominado "Blue Ribbon Committee" que se encargaría de investigar transacciones realizadas por el Gobierno anterior. El contrato entre PRIME y la Autoridad fue uno de los asuntos objeto de investigación por parte de dicho comité, el cual remitió el asunto a la Oficina del Procurador General y al Contralor de Puerto Rico, quienes -a su vez- lo remitieron ante nuestra atención.

A la luz de este trasfondo fáctico, debemos determinar si Rivera Vicente violó los Cánones 18, 21, 37 y 38 de los de ética profesional. Comenzaremos por analizar si Rivera Vicente violó los postulados éticos contenidos en el Canon 21 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX, C. 21.

## II

En lo pertinente, el Canon 21, *supra*, dispone que:

> El abogado tiene para con su cliente un deber de **lealtad completa**. Este deber incluye la obligación de **divulgar** al cliente todas las circunstancias de sus relaciones con las partes y con terceras personas, y cualquier interés en la controversia que pudiera influir en el cliente al seleccionar su consejero. Ningún abogado debe aceptar una representación legal cuando su juicio profesional pueda ser afectado por sus **intereses personales**.
>
>     …
>
> La obligación de representar a un cliente con fidelidad incluye la de **no divulgar sus secretos** o **confidencias** y la de adoptar medidas adecuadas para evitar su divulgación. Será altamente impropio de un abogado el utilizar las confidencias o secretos de un cliente **en perjuicio de éste**. (énfasis suplido)

Como se desprende del texto citado, el Canon 21, *supra*, establece un deber de lealtad completa de parte del abogado que conlleva, entre otras cosas, evitar incurrir en conflictos de intereses. El conflicto de intereses contemplado en el Canon 21, *supra*, presenta tres (3) situaciones que deben ser evitadas por todo abogado: (1) que en beneficio de un cliente se abogue por aquello a lo que el letrado debe oponerse en cumplimiento de sus

obligaciones con otro cliente (representación simultánea adversa); (2) que un abogado acepte la representación de un cliente en asuntos que puedan afectar adversamente algún interés de un cliente anterior (representación sucesiva adversa); y (3) que un abogado acepte una representación legal, o continúe en ella, cuando su juicio profesional pueda ser afectado por sus intereses personales. In Re Avilés Cordero, Tosado Arocho, res. el 5 de septiembre de 2002, 2002 TSPR 124; In Re Sepúlveda Girón, 155 D.P.R. 361 (2001). Dicho Canon también contempla el potencial conflicto entre los intereses mencionados. Id.

Como parte del deber de lealtad, el Canon 21, supra, le impone al abogado la obligación de guardar las confidencias del cliente y evitar su divulgación. Asimismo, el Canon aludido veda el uso y divulgación de las confidencias del cliente por parte del abogado en perjuicio de éste. In Re Bonilla Rodríguez, res. el 17 de julio de 2001, 2001 TSPR 110; Liquilux Gas Corp. v. Berríos, 138 D.P.R. 850 (1995).

Sin duda, el propósito esencial de los postulados éticos contenidos en el Canon 21, supra, es reglamentar la conducta profesional que, de alguna forma, pueda poner en peligro el principio de lealtad y confidencialidad que caracteriza la relación abogado-cliente. In Re Avilés Cordero, supra; In Re Toro Cubergé, 140 D.P.R. 523 (1996).

Como señalamos antes, una de las modalidades de conflictos que pretende atender el Canon 21, supra, es el

conflicto basado en intereses personales del abogado. Ello en vista de que el deber de lealtad que impone el Canon 21, *supra*, comprende -entre otras cosas- el requisito de ejercer un criterio profesional independiente y desligado de los intereses personales. Por tanto, una de las situaciones que el Canon aludido proscribe es aquella en la cual el deber de lealtad que tiene el abogado para con su cliente podría ser incompatible con algún interés propio que éste también quiera promover. In Re Morell Corrada; Alcover García, res. el 5 de marzo de 2003, 2003 TSPR 34; In Re Bonilla Rodríguez, *supra*; Liquilux Gas Corp. V. Berríos, *supra*. En un caso donde se manifiesta este tipo de conflicto, el abogado está frente al dilema de cumplir, o dejar de hacerlo, con su deber de representar a su cliente de forma efectiva, por ser incompatible con la defensa de sus propios intereses. In Re Sepúlveda Girón, *supra*.

Tal como surge del texto mismo del Canon 21, *supra*, en los casos en que existan intereses encontrados, el deber de lealtad completa exige que el abogado divulgue todas aquellas circunstancias sobre relaciones con terceras personas que puedan afectar la relación abogado-cliente. De la misma forma, le exige al abogado divulgar cualquier interés que tenga en el asunto que se le ha encomendado.

Sobre este último requisito nos pronunciamos ampliamente en In Re Morell Corrada, *supra*. En esa ocasión reiteramos nuestra preocupación de que el juicio

profesional independiente de un abogado pudiese ser afectado por su interés personal en una transacción comercial con un cliente. Allí reconocimos que en ese tipo de transacción el conflicto de interés puede surgir, no sólo de la participación personal del abogado en el negocio, sino incluso por virtud de una tercera persona jurídica que intervenga en el mismo, como lo sería el caso de una transacción comercial entre un cliente y una corporación en la que el abogado tenga un interés. Además, reiteramos lo resuelto en In Re Toro Cubergé, *supra*, a los efectos de que, aún en tales casos, el abogado estará sujeto a cumplir con las cánones de ética, exigiéndose que satisfaga ciertos requisitos mínimos de divulgación y de orientación con respecto a su cliente.

En particular, partiendo de la Regla Modelo 1.8 (a) de la American Bar Association, resolvimos que todas las transacciones entre un cliente y su abogado deben ser justas y razonables para el cliente y que se requiere que se le otorgue al cliente: (i) una oportunidad razonable de obtener consejo legal independiente sobre la transacción y; (ii) una divulgación detallada sobre la transacción de manera que éste pueda entenderla razonablemente. En esa ocasión aclaramos que estos requisitos mínimos de divulgación no son requisitos *pro* forma. Tanto así que gran parte de las acciones disciplinarias bajo la Regla Modelo 1.8(a), o su equivalente en las jurisdicciones estatales, se producen debido a la omisión de los abogados

de realizar las divulgaciones necesarias. De hecho, en ese caso determinamos que los abogados querellados violaron el Canon 21, *supra*, precisamente por no haber cumplido con el deber de divulgación mencionado y porque no se le dio al cliente una oportunidad razonable de obtener consejo legal independiente.

A la luz de estos principios, debemos resolver tres asuntos medulares: (1) si la transacción realizada entre la corporación PRIME –de la que Rivera Vicente era accionista– y la Autoridad cumple con las normas establecidas sobre las transacciones entre abogado y cliente; (2) si Rivera Vicente se ubicó en un conflicto entre el deber de lealtad hacia la Autoridad que supone la relación abogado-cliente y las obligaciones asumidas en la subcontratación entre PRIME y el Bufete, y (3) si Rivera Vicente usó confidencias de su cliente en perjuicio de éste. Veamos.

A

Antes de analizar la transacción ocurrida entre PRIME y el Bufete, es necesario considerar si la participación del Bufete en una etapa anterior, a saber, en la redacción del contrato modelo que se usaría con el consorcio seleccionado podría entenderse como una violación del Canon 21, *supra*, de parte de Rivera Vicente. Para llegar a una determinación a esos fines, debemos tener presente que nuestra normativa sobre conflictos imputados –como norma general– no tiene el alcance de transferirle el conflicto de interés personal que pueda tener un abogado a los demás

miembros del Bufete. Más bien, siempre que hemos hablado de conflictos imputados lo hemos hecho en el contexto de conflictos obligacionales. Véase Liquilux Gas Corp. v. Berríos, *supra*; P.R. Fuels v. Empire Gas, 133 D.P.R. 112 (1993).

Los conflictos obligacionales son aquellos que surgen en supuestos de **representación simultánea y sucesiva adversa**. Es decir, existe un conflicto de obligación cuando hay representaciones simultáneas o sucesivas de clientes donde los intereses de éstos están en conflicto con el deber de guardar confidencias que tiene el abogado con cada uno. In Re Belén Trujillo, 126 D.P.R. 743 (1990). Así, pues, la prohibición sobre conflictos basados en representación simultánea y sucesiva adversa está dirigida a garantizarle "a todo cliente que las confidencias y los secretos que compartió con su abogado no serán utilizados en su contra, en beneficio de una representación antagónica, de un cliente simultáneo o posterior". Córdova Ramos v. Larín Herrera, 151 D.P.R. 192 (2000); Otaño v. Vélez, 141 D.P.R. 820 (1996). Sin embargo, en casos donde el alegado conflicto no se relaciona con representaciones simultáneas o anteriores, sino con **conflictos personales**, de ordinario, no se presenta el riesgo de que el abogado divulgue confidencias porque no existe **dualidad de clientes**. Es por eso que no le hemos aplicado los conflictos personales de un abogado a todos los miembros del bufete y únicamente le hemos imputado un conflicto de

un abogado a los demás ante el riesgo de confidencias compartidas[2]. Véase <u>Liquilux Gas Corp. v. Berríos</u>, *supra*; <u>P.R. Fuels v. Empire Gas</u>, *supra*.

En este caso, precisamente, nunca hubo relación dual abogado-cliente porque –para estos fines– la Autoridad fue el único cliente del Bufete ya que PRIME en todo momento tuvo representación legal independiente, incluso después que terminó la relación profesional entre el Bufete y la Autoridad. En vista de lo anterior, debemos descartar la aplicación de las doctrinas sobre representación simultánea y sucesiva adversa a los hechos que nos ocupan.

Las imputaciones sobre intereses encontrados que presenta este caso se relacionan, más bien, con los intereses personales de Rivera Vicente en el esquema que dio lugar al contrato entre PRIME y la Autoridad. En vista de ello, y tomando en cuenta la normativa antes esbozada, debemos concluir que no se configuró una violación al Canon 21, *supra*, en la etapa de la redacción del contrato modelo, toda vez que el conflicto personal lo acarreaba únicamente Rivera Vicente y él no participó en dicha encomienda legal.

---

[2] La Regla Modelo 1.10(a) de la American Bar Association sobre imputación de conflictos de interés establece una norma similar. La misma dispone que mientras los abogados están asociados a una firma no pueden representar a un cliente cuando <u>alguno de ellos</u>, de haber estado practicando solo, estaría impedido de hacerlo, **a menos que la prohibición se base en intereses personales** y no presente el riesgo de limitar significativamente la representación del cliente por los demás miembros de la firma. <u>Model Rules of Professional Conduct</u>, American Bar Association, Ed. 2006, Regla 1.10(a), pag. 47. Por tanto, según dicha Regla los conflictos de intereses personales, de ordinario, no se le imputan a otros miembros del bufete.

La infracción al Canon 21, *supra*, que hubiera podido ocurrir se hubiera basado en el incumplimiento con el deber de divulgación y representación legal independiente, mas en esa etapa no había interés que divulgar porque el Bufete no tenía un interés personal en la encomienda. Reiteramos que dicho interés lo poseía, únicamente, Rivera Vicente, quien no se lo transfirió a los demás miembros del Bufete y quien, además, no participó en la gestión aludida.

Conforme a lo anterior, y tomando en cuenta que en este caso no existe un problema de representación simultánea o sucesiva adversa, sino de conflictos basados en los intereses personales de un abogado, concluimos que los incidentes anteriores a la transacción entre PRIME y la Autoridad, en específico, la redacción del contrato modelo realizada por el Bufete, no representa una violación al Canon 21, *supra*, de parte de Rivera Vicente.

Aclarado lo anterior, pasemos a analizar la transacción ocurrida entre PRIME y la Autoridad. Primero, debemos tener presente que para la fecha en que PRIME le hizo la propuesta a la Autoridad para implementar el Plan, el Bufete aún tenía vigente un contrato de servicios profesionales con dicha entidad. Aunque para esa fecha todavía no se había cumplido con el trámite de incorporación de PRIME, lo cierto es que -de todas maneras- la existencia de una persona jurídica no exime al abogado de los rigores éticos contenidos en el Canon 21, *supra*. En Morell Corrada, *supra*, nos expresamos a esos efectos y

resolvimos que cuando se realiza una transacción entre una corporación en la que el abogado tiene un interés y el cliente, se activan los requisitos de divulgación dispuestos en el Canon 21, *supra*.

En vista de que Rivera Vicente –como componente del Bufete– era representante legal de la Autoridad para el momento en que se iniciaron las negociaciones para contratar con la entidad de la que él era accionista, tenemos que evaluar si la transacción en cuestión cumplió con los requisitos necesarios para evitar la infracción al Canon 21, *supra*, en la modalidad de conflicto por intereses personales del abogado. A esos fines, debemos determinar si la transacción en cuestión fue justa y razonable para la Autoridad. En particular, es preciso examinar si dicha entidad tuvo una oportunidad razonable de obtener consejo legal independiente sobre la transacción y si Rivera Vicente le ofreció una divulgación detallada sobre la misma y sobre su relación con PRIME.

Según se desprende de la determinaciones de hechos del Comisionado Especial, el propio Rivera Vicente le hizo a la Autoridad la divulgación necesaria sobre su relación con PRIME y sobre los conflictos que eso pudiera acarrear en la relación abogado-cliente. De la misma forma, se determinó que la Autoridad no fue asesorada por el Bufete durante la negociación del Contrato con PRIME, sino que tuvo representación legal independiente en todo momento. Conforme a ello, concluimos que la Autoridad fue

debidamente informada sobre los intereses de Rivera Vicente en la transacción y tuvo una oportunidad razonable de obtener consejo legal independiente antes de realizarla.

Por otro lado, el Comisionado Especial determinó que fue la propia Autoridad quien se interesó en la idea de PRIME para trabajar el problema de los desperdicios sólidos en el país y fue a petición suya que se le presentó la propuesta. De sus determinaciones surge, además, que la Autoridad vio en PRIME un mecanismo eficaz para implantar los pormenores del Plan, a la vez que lograba hacerse partícipe de la política pública diseñada por la administración entonces vigente, a los efectos de incluir al sector privado en actividades tradicionalmente realizadas por el Gobierno. Asimismo, se desprende que la Autoridad expresó estar satisfecha con los servicios rendidos por PRIME y entendió que su trabajo fue bueno. Por tanto, no existen indicios de que la transacción realizada por PRIME y la Autoridad redundara en perjuicio de ésta ni de que la misma fuera injusta o irrazonable.

A la luz de todo lo anterior, entendemos que se cumplen en este caso los requisitos establecidos para asegurar la razonabilidad de la transacción entre abogado y cliente y, por ende, en cuanto a este asunto no encontramos infracción al Canon 21, *supra*.

B

De otra parte, debemos resolver si la relación contractual entre PRIME y el Bufete ubicó a Rivera Vicente

en un conflicto o potencial conflicto entre su deber de lealtad hacia la Autoridad y las obligaciones asumidas con PRIME como subcontratista. Para atender este asunto, conviene tener en mente que el Canon 21, *supra*, contempla que un abogado sea contratado por un tercero para ofrecerle servicios legales a determinado cliente y que, incluso, sea ese tercero quien pague sus honorarios. En tales casos, el cliente es la persona cuyo interés representa el abogado, aunque haya sido un intermediario quien contrató con él. Véase In Re Semidey Morales, 151 D.P.R. 842 (2000).

En el caso que nos ocupa, precisamente, un intermediario (PRIME) contrató al Bufete para que le rindiera servicios legales a la Autoridad y los honorarios correspondientes serían pagados por dicho intermediario. Ahora bien, el Procurador General alega que dicho esquema produjo una infracción al Canon 21, *supra*, porque el Bufete estaba obligado con cada uno de los principales contratantes. Por un lado, era subcontratista de PRIME y, por otro lado, era representante legal de la Autoridad. El Procurador General alega que tales obligaciones son incompatibles. No estamos de acuerdo.

Ciertamente, la relación abogado-cliente conlleva que el abogado despliegue completa lealtad hacia su cliente y, por su parte, la relación del Bufete con PRIME también suponía cierto grado de lealtad. No obstante, nada en el expediente indica que ambas exigencias fueran incompatibles. Por el contrario, notamos que en el Contrato

suscrito con la Autoridad, PRIME se obligó a serle leal a la Autoridad y a requerir lo mismo de parte de sus subcontratistas. En efecto, el Bufete —como subcontratista de PRIME— se obligó a ser leal a PRIME y a cumplir con todo aquello a lo que ésta se hubiera obligado. Por tanto, si bien el Bufete se obligó a serle leal a PRIME, lo cierto es que ésta —a su vez— se obligó a sí misma y a sus subcontratistas a ser leal a la Autoridad. En vista de ello, sostenemos que no ocurrió un desvío de la lealtad que merecía la Autoridad.

Ahora bien, tal como lo contempla el propio Canon 21, *supra*, siempre existe la posibilidad de que surja un conflicto entre la persona que contrató los servicios legales y la persona que, en efecto, los recibe. En tales circunstancias, procede que el abogado no represente a ninguno de ellos. En específico, el Canon aludido dispone que "[c]uando un abogado representa a un cliente por encomienda de otra persona o grupo, quien le paga al abogado por dicho servicio, debe renunciar la representación de ambos **tan pronto surja una situación de conflicto** de intereses entre la persona o grupo que le paga los honorarios y la persona a quien representa" (énfasis suplido). 4 L.P.R.A. Ap. IX, C. 21.

En este caso, sin embargo, mientras existió la relación abogado-cliente, no ocurrió ningún conflicto entre

PRIME y la Autoridad[3]. Además, en previsión a cualquier conflicto potencial y en cumplimento con las pautas establecidas en el Canon 21, *supra*, las partes acordaron que el Bufete nunca representaría legalmente a PRIME. Incluso, para evitar mayores dudas, desde el inicio mismo de las negociaciones Rivera Vicente se mantuvo a una distancia prudente y PRIME optó por contratar los servicios profesionales del Lcdo. Ruiz Cox para que lo representara en lo concerniente a dicha relación contractual. Por su parte, el Lcdo. Ruiz Cox no discutió con Rivera Vicente los pormenores de la negociación, sino que realizó las comunicaciones necesarias con PRIME a través de su Presidente, el Lcdo. Santiago.

Conforme a lo anterior, debemos concluir que la relación contractual entre el Bufete y PRIME no levantó ni pudo levantar —en las circunstancias de este caso— un conflicto de intereses que le impidiera a Rivera Vicente ejercer un juicio profesional libre de ataduras y cumplir con el deber de lealtad que supone la relación abogado-cliente.

C

Finalmente, también relacionado con las pautas éticas establecidas en el Canon 21, *supra*, debemos determinar si Rivera Vicente usó confidencias de su cliente en perjuicio

---

[3] El único conflicto que consta en el expediente surgió mucho después de haber cesado la relación abogado-cliente, cuando se produjo un litigio entre PRIME y la Autoridad. Aún en dicho litigio PRIME no fue representada por el Bufete.

de éste.  El Procurador General aduce que Rivera Vicente violó el Canon mencionado al utilizar información confidencial surgida de su relación abogado-cliente con la Autoridad para presentar la propuesta de PRIME y que, por tanto, utilizó dicha información para beneficio propio.  Su contención se basa en el hecho de que, por su relación con la Autoridad, el Bufete conocía de la existencia del Plan y de lo que la Autoridad esperaba de los posibles proveedores.

Ahora bien, de las determinaciones de hechos realizadas por el Comisionado Especial surge que el Bufete no participó en la elaboración del Plan cuya implementación le fuera adjudicada eventualmente a PRIME.  También surge de dichas determinaciones que antes de adoptar el Plan la Autoridad difundió la propuesta en los medios de comunicación y celebró vistas públicas en diversos pueblos de la Isla para que la ciudadanía se expresara en cuanto a su contenido.  Además, de las determinaciones fácticas se desprende que la Autoridad le proveyó a otras dos entidades la misma información que se le dio a PRIME para someter la propuesta para la implantación del Plan.  Conforme a lo anterior, debemos concluir -tal como lo hizo el Comisionado Especial- que los pormenores del Plan y los intereses de la Autoridad con respecto al mismo eran de conocimiento público.

Por otro lado, debemos enfatizar que lo que prohíbe el Canon 21, *supra*, es que los secretos o confidencias del

cliente sean usados por el abogado en perjuicio de éste. La Regla Modelo 1.8(b) de la American Bar Association contiene una norma similar a la nuestra, donde se establece que "[u]n abogado no debe utilizar información relacionada a la representación de un cliente en perjuicio de éste, […]" (traducción nuestra). Model Rules of Professional Conduct, American Bar Association, Ed. 2006. Regla 1.8(b), pág. 37. En el comentario correspondiente, se aclara que la Regla pretende evitar, por ejemplo, que un abogado que conoce el interés de su cliente en comprar y desarrollar unas parcelas de terreno, use esa información para comprar una parcela para competir con el cliente o para recomendárselo a un tercero[4]. Id. pág. 39.

En este caso, no existe prueba en el expediente que nos lleve a concluir que Rivera Vicente utilizó el conocimiento que tenía sobre los detalles del Plan y los intereses de la Autoridad en perjuicio de ésta. Por el contrario, de las determinaciones de hechos del Comisionado Especial surge que la Autoridad escogió la propuesta de PRIME porque encontró que la misma respondía a sus intereses. Asimismo, se determinó que la Autoridad se sintió complacida con los servicios rendidos por PRIME para la implantación del Plan. Conforme a lo anterior, entendemos que no existe prueba suficiente para concluir

---

[4] Véase, además, para fines ilustrativos, In Re Swihart, 517 N.E. 2d 792 (Ind. 1988); In Re Jordan, 712 P. 2d 97 (Or. 1985); In Re Nigohosian, 442 A. 2d 1007 (N.J. 1982); In Re Nulle, 620 P. 2d 214 (Ariz. 1980).

que Rivera Vicente usó información confidencial surgida de la relación abogado-cliente para perjudicar a la Autoridad.

Por las razones expuestas, concluimos que no existe prueba clara, robusta y convincente para determinar que Rivera Vicente violó el Canon 21, *supra*, en los diversos aspectos discutidos.

III

Analicemos ahora si Rivera Vicente actuó en contravención a los postulados éticos contenidos en el Canon 37 del Código de Ética Profesional. En específico, debemos resolver si su participación en el desarrollo de PRIME y la ulterior contratación de ésta con la Autoridad tuvo como fin directo o indirecto proporcionarle trabajo profesional lucrativo que de otra forma no hubiese obtenido.

El Canon 37 establece que la participación del abogado en negocios o actividades comerciales no es propia de la buena práctica de la abogacía "si tal negocio o actividad tiene el fin directo o indirecto de proporcionarle trabajo profesional lucrativo que de otra forma el bufete no hubiese obtenido". 4 L.P.R.A. Ap. IX. C. 37. Así, pues, un abogado puede dedicarse a actividades ajenas a su profesión y nuestra jurisdicción disciplinaria no se extiende a ese ámbito a menos que se realice con "el fin directo o indirecto de proporcionarle trabajo profesional lucrativo que de otra forma el bufete no hubiese obtenido". In Re

Belén Trujillo, supra; In re Roldán Figueroa, 106 D.P.R. 4 (1977); In re Clavell Ruiz, 106 D.P.R. 257 (1977).

Evidentemente, para determinar si se ha configurado una violación al Canon 37, *supra*, es preciso analizar las razones que pudieron haber movido a un abogado a participar en determinada actividad de negocios o de índole comercial. En este caso, conforme surge de los hechos determinados por el Comisionado Especial, Rivera Vicente ideó el concepto de PRIME antes de comenzar la relación profesional con la Autoridad, y lo hizo con el fin de participar del modelo de desarrollo económico propulsado por la administración entonces vigente. De las determinaciones fácticas se desprende, además, que para la fecha en que se suscribió el contrato entre PRIME y la Autoridad, ya el Bufete tenía vigente un contrato de servicios legales con esta última. Por tanto, si bien PRIME le proveyó al Bufete trabajo profesional, lo cierto es que no se cumple el segundo elemento requerido por el Canon 37, *supra*, a saber, que sea trabajo que de otra forma no hubiese obtenido.

Determinar que la creación de PRIME y su ulterior contratación con la Autoridad obedeció al interés de proporcionarle al Bufete trabajo legal que, de otra forma, no hubiera obtenido, requeriría un análisis altamente especulativo. Ello en vista de que –como dijimos antes– el Bufete ya tenía un contrato de servicios profesionales con la Autoridad y no existen razones para sostener que la Autoridad pretendía terminar con el mismo. En

consecuencia, no podemos sostener que la actividad incurrida por Rivera Vicente a través de PRIME le proporcionó al Bufete trabajo profesional que, de otra forma, no hubiera obtenido. Por ende, concluimos que no se configuró una infracción al Canon 37, *supra*, del Código de Ética Profesional.

IV

Por otro lado, es preciso resolver si Rivera Vicente desplegó falta de diligencia y capacidad en su desempeño como abogado de la Autoridad. En lo pertinente, el Canon 18 del Código de Ética Profesional dispone que es deber del abogado defender los intereses del cliente diligentemente, desplegando en cada caso su más profundo saber y habilidad y actuando en aquella forma que la profesión jurídica estime adecuada y responsable. 4 L.P.R.A. Ap. IX, C.18. El Procurador General alega que Rivera Vicente no cumplió con las exigencias de este Canon toda vez que su relación profesional con la Autoridad no se caracterizó por la mayor diligencia ni la más completa honradez.

No obstante, entendemos que no existe prueba suficiente para concluir que Rivera Vicente desplegó falta de diligencia en su relación profesional con la Autoridad. Por el contrario, de la prueba creída por el Comisionado Especial surge que –a través del Bufete– Rivera Vicente cumplió con la diligencia requerida por la relación abogado-cliente, al punto de que la Autoridad siempre estuvo satisfecha con su desempeño. El Comisionado

Especial también entendió que no se presentó prueba clara, robusta y convincente con respecto a esta alegación. En vista de que se trata de una determinación basada en la suficiencia de la prueba presentada, no estamos en posición de distanciarnos de la conclusión del Comisionado Especial.

V

Finalmente, debemos resolver si Rivera Vicente incurrió en apariencia de conducta impropia y si no cumplió con el deber de exaltar el honor y la dignidad de la profesión, según lo prescribe el Canon 38 del Código de Ética Profesional.

Respecto a los deberes mencionados, el Canon 38 establece que: "[e]l abogado deberá esforzarse, al máximo de su capacidad, en la exaltación del honor y dignidad de su profesión, aunque el así hacerlo conlleve sacrificios personales y debe evitar hasta la apariencia de conducta profesional impropia." 4 L.P.R.A. Ap. IX. C. 38. Al interpretar este Canon hemos sostenido que "[c]ada abogado es un espejo en que se refleja la imagen de la profesión... que se debe representar con limpieza, lealtad y el más escrupuloso sentido de responsabilidad." In re Quiñónez Ayala, res. el 30 de junio de 2005, 2005 TSPR 99. Es por eso que debe cuidarse de que sus actuaciones no den margen a la más leve sospecha de impropiedad. Esta normativa responde al hecho de que la mera apariencia de conducta impropia puede resultar perniciosa, minando el respeto de la ciudadanía por sus instituciones de justicia y la

confianza de los clientes en sus abogados. In re Vega Morales, res. el 17 de marzo de 2006, 2006 TSPR 55.

Por tanto, al evaluar la conducta de Rivera Vicente a la luz de esta normativa debemos examinar si éste evitó hasta la apariencia de infracción a los Cánones de Ética Profesional. Como mencionamos antes, Rivera Vicente se mantuvo a distancia durante la transacción ocurrida entre PRIME y la Autoridad para evitar cualquier duda con respecto a la transparencia del proceso. Asimismo, con idénticos fines Rivera Vicente suscribió una renuncia de parte del Bufete al contrato de servicios profesionales que mantenían con dicha entidad.

Por otra parte, notamos que durante las negociaciones Rivera Vicente procuró no aportar a la representación legal de PRIME, razón por la cual contrató los servicios profesionales del Lcdo. Ruiz Cox. Para conferirle mayor pureza a la transacción, Rivera Vicente también se ocupó de que los pormenores de la negociación entre el Lcdo. Ruiz Cox (como representante legal de PRIME) y la Autoridad no se le informaran a PRIME a través de él, sino por medio del Lcdo. Pedro Santiago, Presidente de PRIME. Además, durante dicho trámite Rivera Vicente se encargó de hacerle a la Autoridad una completa divulgación sobre sus intereses económicos en PRIME y se aseguró de que ésta tuviera consejo legal independiente. Finalmente, vimos que en la subcontratación entre PRIME y el Bufete —del que Rivera Vicente es socio propietario— se acordó que el Bufete nunca

representaría a PRIME y que, incluso, luego de haber finalizado la relación profesional con la Autoridad, el Bufete optó por no representar a PRIME en un litigio que se trabó posteriormente entre ésta y la Autoridad.

De lo anterior se desprende que Rivera Vicente empleó medidas cautelares para evitar incurrir, no sólo en la verdadera impropiedad ética, sino también en la apariencia de impropiedad. En vista de ello, entendemos que no existe la prueba clara, robusta y convincente requerida para demostrar que Rivera Vicente violó el Canon 38, *supra*, de los de ética profesional.

VI

Por los fundamentos que preceden, resolvemos que no se cumplió con el estándar probatorio requerido para demostrar que Rivera Vicente incurrió en las faltas imputadas. En consecuencia, desestimamos la querella presentada en su contra y ordenamos el archivo del asunto.

Se dictará sentencia de conformidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

*In re:*

Carlos Rivera Vicente             CP-2003-21   Conducta
                                               Profesional

Sala Especial integrada por el Juez Presidente señor Hernández Denton, el Juez Asociado señor Rivera Pérez y la Jueza Asociada señora Fiol Matta

SENTENCIA

San Juan, Puerto Rico a 30 de octubre de 2007.

Por los fundamentos expuestos en la Opinión *Per Curiam* que antecede, desestimamos la querella presentada en su contra y ordenamos el archivo del asunto.

Así lo pronuncia y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. La Jueza Asociada señora Fiol Matta disiente con opinión escrita.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

*In re:*

Carlos Rivera Vicente

CP-2003-21

Opinión Disidente emitida por la Jueza Asociada señora FIOL MATTA

En San Juan, Puerto Rico, a 30 de octubre de 2007.

La controversia de autos es una que no puede examinarse aisladamente y como una querella más de conducta profesional, sino que debe considerarse en el contexto del complejo entramado de los contratos entre la empresa privada y el gobierno en nuestro país. Hace más de una década emitimos las palabras que hoy nos deben servir de marco contextual en materia de apariencia de conducta impropia en la gestión pública:

> Debe tenerse en cuenta que vivimos en una época aciaga, que se caracteriza por la creciente y justificada desconfianza de la gente en sus instituciones. Es de conocimiento general que prevalece en el país la sospecha y la suspicacia con respecto a los procesos colectivos. In re Toro Cubergé 140 D.P.R. 523, 535-536 (1996).

Ante esta realidad, nos corresponde cumplir nuestro deber irrenunciable de guardar el delicado balance que garantiza mantener intacta esa confianza colectiva. Cuando el interés público está involucrado, los ojos del país, con mucha razón, escudriñan nuestro proceder con especial recelo. En estas situaciones, la consistencia no puede convertirse en un valor de tal naturaleza que impida desarrollar una norma adecuada a las circunstancias. Ciertamente, debemos velar porque la inconsistencia no ponga en entredicho la legitimidad de nuestro poder inherente para regular la profesión legal.[5] Sin embargo, esa consistencia no debe ser el resultado de una aplicación formalista y mecánica del derecho. La opinión mayoritaria, en aras de ser consistente con las normas que hemos desarrollado para guiar a los abogados y las abogadas al efectuar transacciones de negocios con sus clientes, aplica dichas normas sin considerar que en casos como éste el cliente es, a fin de cuentas, el interés público, lo cual requiere una normativa propia. Además, en el contexto de la contratación con agencias del gobierno, la apariencia cobra mayor importancia, convirtiéndose en foco central de nuestra evaluación ética.

---

[5] En casos de conducta profesional resulta ser singularmente importante emitir decisiones consistentes con nuestras determinaciones anteriores. Ello es así, porque al decidir este Tribunal de determinada manera, en cierta situación fáctica, crea en los abogados la impresión de que nuestra postura será la misma en situaciones sustancialmente similares. In re Silva Iglecia, 2004 T.S.P.R. 87.

Por eso, y por las razones que expondré a continuación, no puedo suscribir la opinión del Tribunal.

I

En su informe del 16 de diciembre del 2002, el Procurador General explicó que comparecía como resultado de su intervención en…

> …investigaciones relacionadas con ciertos abogados que, por medio de contratos de servicios profesionales previos con ciertas dependencias gubernamentales, obtienen información y establecen influencias para posteriormente crear entes corporativos, los cuales, operando a manera de su alter ego, proceden después a contratar con la dependencia gubernamental bajo acuerdos que le resultan sumamente favorables.[6]

Tras estudiar la extensa ponencia del Procurador General, que calificó la conducta del querellado como "alarmante y a todas luces impropia"[7], y luego de haber contado con la comparecencia del querellado, el 13 de octubre del 2003 ordenamos que se presentara la querella correspondiente. Una vez recibida la contestación del imputado a la querella, el 15 de enero de 2004 designamos al Lcdo. Enrique Rivera Santana, Ex Juez del Tribunal

---

[6] En el año 2001, luego del cambio en la administración gubernamental, se nombró un grupo de ciudadanos bajo el nombre de "Blue Ribbon Committee", con la encomienda de fiscalizar la ejecutoria de la administración anterior, en particular la contratación gubernamental que se llevó a cabo como parte de una política publica de privatización. Este grupo refirió la controversia de autos, tanto al Procurador General como al Contralor. Este último también presentó querella contra el Lcdo. Rivera Vicente el 19 de febrero de 2004.

[7] El Procurador General imputó infracciones al Preámbulo del Código de Ética Profesional y su jurisprudencia interpretativa y a los Cánones 37, 21, 18 y 38 de los de Conducta Profesional.

Superior, como Comisionado Especial para que aquilatara la prueba y emitiera las correspondientes determinaciones de hecho y recomendaciones.

Tras examinar la abundante prueba documental y testifical presentada por las partes, el Comisionado Especial produjo un informe con extensas determinaciones de hechos, de las cuáles sólo reproduciré las que entiendo pertinentes para sostener mi disenso.

A la fecha de los hechos, el querellado era uno de los socios propietarios del Bufete Cancio Nadal, Rivera, Díaz y Berríos, en adelante el Bufete, con un 30% de participación en el mismo. Desde el 1991 fungía como su socio administrador. En el 1994, el Bufete comenzó sus relaciones contractuales con la Administración de Desperdicios Sólidos, en adelante ADS. Como parte de sus servicios, el Bufete se obligaba a revisar y estudiar documentos legales que versaran sobre materias que requirieran conocimiento especializado en el campo de derecho ambiental; preparar proyectos de contrato entre la ADS y terceras personas y a preparar proyectos especializados, enmiendas de ley y reglamentación con relación al manejo y recuperación de desperdicios sólidos. Dada la política pública gubernamental de privatizar algunas gestiones gubernamentales, el querellado encauzó los recursos de su Bufete en la encomienda de crear una entidad en forma de consorcio que integrara servicios variados para atender requerimientos programáticos del Gobierno. De acuerdo al

Comisionado Especial, **la idea fue tomando forma a partir del 1994, el mismo año en que la ADS contrató los servicios profesionales del Bufete**. El consorcio se llamó Integrated Services Partnership, en adelante I.S.P.  El Bufete siempre se consideró como el componente que ofrecería asesoría legal dentro de I.S.P.

En marzo del 1995 la ADS adoptó el "Plan de infraestructura para el reciclaje y la disposición de desperdicios sólidos", en adelante el Plan. Una vez la ADS adoptó este Plan, el Bufete comenzó a ampliar los servicios profesionales que ofrecía a esa agencia y a aumentar sustancialmente sus honorarios, mediante enmiendas al contrato de servicios profesionales. De acuerdo al Informe del Comisionado Especial, el 28 de mayo de 1996 y en febrero de 1997 el Bufete escribió a los correspondientes Directores Ejecutivos de la ADS, explicándoles que en vista de que la implantación del Plan estaba en etapas más complejas, se proyectaba una mayor dependencia de la agencia en entidades especializadas, entre ellas, el Bufete. Según nos informó el Comisionado Especial, **en la comunicación de febrero de 1997 se da constancia del conocimiento en detalle que tenía el querellado sobre el Plan.**

De acuerdo a las determinaciones de hechos del Comisionado Especial, a principios del 1998, el querellado se reunió con el entonces Gobernador, Dr. Pedro Roselló González, a quien "le presentó la idea del consorcio que ya

antes había visualizado." Al cabo de esa reunión, el Gobernador dio instrucciones a los miembros de su gabinete de implantar la idea del consorcio. Mediante orden ejecutiva del 19 de abril de 1998, el Plan se elevó a política pública gubernamental en materia de desperdicios sólidos. El 21 de mayo de 1998, el querellado se comunicó nuevamente con el Gobernador, esta vez por escrito. De acuerdo al Comisionado Especial en dicha misiva le detalló la idea propuesta y sugirió que se adoptara el consorcio y un Comité de la ADS, cuyo propósito sería el de garantizar la continuidad y consistencia en la implantación del Plan. Para ese momento, ya el comité de la ADS se había creado y **el querellado formó parte del mismo.** Consecuentemente, I.S.P. le hizo una presentación a la ADS. **Todo lo anterior ocurrió durante la vigencia del contrato de servicios profesionales entre el Bufete y la ADS.**

El 22 de junio de 1998, el querellado le envió una carta a la Directora Ejecutiva de la ADS en la que se resaltaba el hecho de que **el Bufete había prestado servicios legales a la ADS relacionados a la implantación del Plan.** En dicha misiva se solicitaba la renovación del contrato con el fin de que la ADS pudiera contar con los servicios legales del Bufete y así "poder cumplir con las altas encomiendas públicas que la misma se ha trazado."

En septiembre de 1998 **el Bufete y la entonces Directora de la División Legal de la ADS prepararon un modelo del contrato que suscribiría la ADS con el consorcio que se**

**escogiera para la implementación del Plan.** El 2 de octubre de 1998, ya estaba elaborado el concepto final del consorcio, por lo que a petición de la ADS, I.S.P. sometió una propuesta a dicha agencia para que ese consorcio se hiciera cargo de proseguir la implantación del Plan. Otras dos entidades también presentaron sus respectivas propuestas. El 7 de octubre, el querellado envió una carta al Director Ejecutivo de la ADS, en la que **se hace mención de las reuniones que la ADS y el Bufete celebraron para viabilizar la propuesta de trabajo que sometió el consorcio.** El Comisionado Especial cita de la misiva lo siguiente:

> Para viabilizar una propuesta de trabajo abarcadora y responsable, que concretara nuestros ofrecimientos para responder a las necesidades reales de la ADS, el consorcio de entidades se reunió entre sí y con el personal de dicha agencia los días 15, 19, y 29 de septiembre de 1998. Destaco la reunión del 19 de septiembre del 1998…, por cuanto en dicha ocasión se nos brindó un cuadro del estado de la situación de todos los proyectos comprendidos en la Fase I de la implantación del Plan. **Gracias a la información provista, CNR&D [el Bufete] y el grupo de profesionales [integrantes del consorcio], pudimos elaborar la propuesta de trabajo que se describe en el borrador de contrato que respetuosamente sometemos ante su consideración y el cual contiene términos y condiciones sumamente razonables para asistir a la ADS a alcanzar las metas trazadas en un proyecto de magna envergadura como lo es la implantación del Plan.** (Énfasis nuestro.)

El 16 de octubre de 1998 se presentó el certificado para la incorporación de la Puerto Rico Infraestructure Management Group, Inc., en adelante PRIME, sucesora de I.S.P. PRIME sería un consorcio de servicios integrados **encaminado a proveer a la ADS todo lo relacionado con la**

**disposición de desperdicios sólidos en Puerto Rico y en la implantación del Plan.** El Bufete se encargaría de toda la fase legal relacionada con el Plan. Desde su incorporación, **PRIME solo tuvo dos accionistas, de los cuales el querellado fue el mayoritario, con un 75% de las acciones de la corporación.**

Una vez seleccionada **PRIME, ésta y la ADS trabajaron en la elaboración de un contrato que se conocería como el Management Assistance Service Agreement, en adelante MASA, que regiría la incumbencia de PRIME en la implementación del Plan.** Como el Bufete era una de las entidades que formaban parte de PRIME, y aún estaba vigente el contrato de servicios profesionales entre éste y la ADS, **una de las asesoras legales de la agencia expresó preocupación por que fuera el querellado quien negociara los términos y condiciones del MASA.** Fue entonces cuando PRIME subcontrató a otro abogado para que fungiera como su representante y negociara el MASA con la ADS. **Durante la negociación del MASA, nuevamente la representación legal de la ADS planteó la posibilidad de conflicto de intereses por parte del Bufete, al tener un contrato vigente con la agencia y a la vez ser parte de PRIME.** El Bufete optó entonces por dar por terminado el contrato de servicios profesionales que tenía con la ADS el 16 de noviembre de 1998.

A pesar de que se había escogido al Lcdo. Pedro Santiago como el intermediario entre la ADS y PRIME, por ser presidente de esta última entidad, surge de las

determinaciones de hecho del Comisionado Especial que **el querellado estuvo involucrado en el proceso de contratación.** Por ejemplo, **se obtuvo su aprobación sobre lo que resultó ser la estipulación del alcance del trabajo acordado; el querellado también aprobó el acuerdo sobre honorarios y otros gastos a pagarse a PRIME y a sus entidades.** Luego de por lo menos 40 borradores, el 15 de enero de 1999 se autorizó el otorgamiento del contrato entre la ADS y PRIME.

De acuerdo a lo pactado, PRIME proveería todos los servicios legales relacionados con los proyectos de infraestructura, además se le facultaba para subcontratar a cada una de las entidades que componían el consorcio, incluyendo al Bufete. A PRIME se le asignó la suma de $5,500,000.00 para servicios de consultoría por seis meses. El costo anual máximo para el desarrollo de los proyectos durante el tiempo acordado ascendía a $8, 779, 200.00, además del 10% de ese importe para el reembolso de gastos. De esa suma se fijó al Bufete la cantidad de $1,320,000.00 más $132,000.00 para el reembolso de gastos, en total $1,452,000.00. Además de las cantidades asignadas a cada uno de los componentes de PRIME, a PRIME como tal se le asignó la suma máxima anual de $1,200,000.00 más $120.000.00 para el reembolso de gastos. **PRIME pagaba un salario al querellado facturado a la ADS en concepto de servicios de consultoría; al año 2000 se fijó esta suma en $144,000.00 anuales. Además, desde el 1999 y durante la**

**vigencia del MASA, el querellado recibía un estipendio mensual de $2000.00 por concepto de gastos de automóvil y otras misceláneas. Adicional a eso, por lo menos en dos ocasiones PRIME distribuyó dividendos a sus dos accionistas, entre ellos, el querellado.**

Resulta imperativo mencionar que Comisionado Especial resalta en su informe que el contrato entre PRIME y la ADS disponía que **los subcontratistas componentes del consorcio observarían completa lealtad a la ADS**, mientras que en el contrato entre el Bufete y PRIME, **el Bufete prometió completa lealtad a PRIME.** Es decir, el Bufete prometió su lealtad, tanto a la ADS como a PRIME.

Según relata el Comisionado, desde abril de 1999 se había acordado que "para garantizar la transparencia de los procedimientos el querellado no participaría en los asuntos que tuvieran que ver con la facturación", pero **a pesar de esto, el querellado, era miembro de la Junta de Directores de PRIME y estuvo presente en sus reuniones.**

El 19 de septiembre de 1999, la Junta de Directores de PRIME acordó que pagaría a una entidad llamada CRV Real Estate Holding la suma de $4,000.00 mensuales más utilidades (agua, luz y teléfono) por el alquiler de una propiedad en la Urbanización Río Mar en Río Grande, Puerto Rico. Esta propiedad sería utilizada como oficina y centro de operaciones de PRIME. El 19 de octubre de 1999 se incorporó en el Departamento de Estado la corporación con fines de lucro CRV Real Estate Holding, Inc. De acuerdo al

Comisionado Especial, dicha propiedad había pertenecido al querellado y a su esposa, hasta que la vendieron a CRV Estate Holding, Inc.

Según el Comisionado Especial, todos los servicios profesionales de naturaleza legal que necesitó la ADS en el área ambiental, fueron prestados por el Bufete de la misma manera en que ocurría cuando el contrato de servicios entre la ADS y el Bufete era directo. La diferencia radicaba en que la facturación del Bufete se hacía a través de PRIME, pero el pago lo hacía la ADS a nombre del Bufete. Durante toda la vida corporativa de PRIME, su único cliente fue la ADS, por lo que todos los ingresos que percibió fueron otorgados por esa agencia.

Al concluir su detallado informe, el Comisionado expresó que halló incurso al querellado en violación a los cánones 21, 37 y 38 de ética profesional.

Es norma conocida que le corresponde al Comisionado Especial desempeñar una función similar al juzgador de instancia, es decir, éste debe recibir la prueba y dirimir la evidencia conflictiva. En consecuencia hemos resuelto que sus determinaciones fácticas merecen nuestra mayor deferencia. Por lo tanto, aunque este Tribunal no está obligado a aceptar el informe del Comisionado Especial nombrado para atender una querella contra un abogado, pudiendo adoptar, modificar o rechazar tal informe, de ordinario sostenemos las conclusiones de hecho de un Comisionado Especial salvo que se demuestre perjuicio,

parcialidad o error manifiesto. In re Morales Soto, 134 D.P.R. 1012 (1994). In re Moreira Avillán, 147 D.P.R. 78, 86 (1991); In re Soto López, 135 D.P.R. 642 (1994). In re Gordon Meléndez, 2007 TSPR 108.

Sorprende la manera en que la Mayoría ha obviado dichas determinaciones de hecho en este caso, pasando por alto la doctrina que hemos elaborado sobre el trato a los informes de dicho funcionario. Por el contrario, tras efectuar un examen exhaustivo del informe rendido por el Comisionado Especial que nombramos, y la prueba que obra en el expediente, no encuentro razón por la cual debamos intervenir con sus determinaciones fácticas.

Aunque concuerdo con la opinión mayoritaria en cuanto a que el querellado no incumplió con el Canon 37 de Ética Profesional, concurro con el Comisionado Especial en cuanto a que el querellado sí incurrió en violación a los Cánones 21 y 38. Su conducta laceró la imagen de la abogacía y en efecto aparentó impropiedad y posible conflicto de lealtades al estar su juicio profesional influenciado por sus intereses personales en la gestión publica y al quedar su lealtad comprometida y fraccionada entre sus intereses pecuniarios, su posición en el Bufete y su deber para con la ADS. Debo reconocer que el querellado, en efecto, cumplió con los requisitos que establecimos jurisprudencialmente en In re Morell Corrada y Alcover García, 158 D.P.R. 791 (2003), pero según hemos resuelto, el cumplimiento de esos requisitos no puede ser *pro forma* y

debe ser evaluado en conjunto con los establecidos en el Canon 38, con el cual el querellado sí incumplió.

II

De acuerdo al Canon 21 de los de Ética Profesional, que versa sobre el tema de los intereses encontrados:

El abogado tiene para con su cliente un deber de lealtad completa.

Este deber incluye la obligación de divulgar al cliente todas las circunstancias de sus relaciones con las partes y con terceras personas, y cualquier interés en la controversia que pudiera influir en el cliente al seleccionar su consejero.

**Ningún abogado debe aceptar una representación legal cuando su juicio profesional pueda ser afectado por sus intereses personales**.

No es propio de un profesional el representar intereses encontrados. Dentro del significado de esta regla, un abogado representa intereses encontrados cuando, en beneficio de un cliente, es su deber abogar por aquello a que debe oponerse en cumplimiento de sus obligaciones para con otro cliente.

La obligación de representar al cliente con fidelidad incluye la de no divulgar sus secretos o confidencias y la de adoptar medidas adecuadas para evitar su divulgación.

Un abogado no debe aceptar la representación de un cliente en asuntos que puedan afectar adversamente cualquier interés de otro cliente anterior ni servir como árbitro, especialmente cuando el cliente anterior le ha hecho confidencias que puedan afectar a uno u otro cliente, aun cuando ambos clientes así lo aprueben.

Será altamente impropio de un abogado el utilizar las confidencias o secretos de un cliente en perjuicio de éste. (Énfasis nuestro.)

La aspiración general que establece el Canon 21 sobre el tema de los intereses encontrados es la lealtad completa que le debe un abogado al cliente y a sus causas. Esta lealtad no es la entrega ciega ni el servilismo, sino la

integridad, consistencia y perseverancia en el compromiso del abogado para con los intereses de su cliente. La lealtad que el abogado debe manifestar está fundamentada en los principios básicos de sinceridad, honradez, transparencia y sensatez que caracterizan el buen ejercicio de nuestra profesión y que mantienen la confianza del pueblo en sus instituciones legales.

En el ordenamiento jurídico, el conflicto de intereses o los intereses encontrados constituyen la antítesis del deber de lealtad. Como hemos explicado anteriormente, al examinar el tema de los intereses encontrados nos enfrentamos al asunto de las incompatibilidades. En In re Carreras Rovira y Suárez Zayas, 115 D.P.R. 778, 788 (1984), definimos la incompatibilidad en dos acepciones. Allí expresamos que la incompatibilidad en el orden físico implica "antagonismo, oposición, repugnancia que tiene una cosa para unirse con otra, o dos o más personas entre sí." En el orden jurídico la incompatibilidad "se refiere a la imposibilidad legal de simultanear dos o más cargos, funciones o misiones una misma persona." Tras prestar esta definición del término, concluimos que "uno de los requisitos para el ejercicio de la abogacía es la compatibilidad de la actuación legal con la situación y circunstancias."

El abogado debe tener presente que su ministerio radica en su conciencia, y que ésta debe ser libre, independiente y alerta, que le dicte las pautas a seguir para un

comportamiento debido y correcto.[8]    Tal y como hemos afirmado, "[l]a premisa es sencilla: quien no sea independiente no está en condiciones de ejercer la profesión." In re Carreras y Suárez, *supra*, pág. 788, citando a A. Fernández Serrano, De las incompatibilidades para ejercer la abogacía, Madrid, Artes Gráficas M.A.G., S.L., 1952, págs. 5-7.  La preservación de la autonomía de juicio del abogado es fundamental para prevenir cualquier tipo de menoscabo a la fidelidad que debe a su cliente.[9] Ramón Mullerat, en su conferencia Una abogacía para América y Europa, 67 Rev. Jur. U.P.R. 563 (1998), expuso una definición contemporánea de las profesiones liberales formulada por el Secretariado Europeo de las Profesiones Liberales:

> …la profesión liberal se caracteriza por su competencia, al exigir prestaciones de calidad elevada; interés público, al dirigirse a satisfacer necesidades vitales de los ciudadanos; prestación de servicio individual, adaptada a las necesidades del cliente; relación de confianza, de la que se deriva el deber de respetar el secreto profesional; **independencia, lo que implica la inexistencia de cualquier género de presión o restricción (incluso la que procede de la propia persona que ejerce la profesión liberal);** ética profesional; y un nivel elevado en la prestación de servicios. *Op. cit.* pág. 576. (Énfasis nuestro.)

Las decisiones que hemos emitido sobre este tema tienen como cimiento los criterios fundamentales antes expuestos. De acuerdo a nuestra tradición disciplinaria, consecuentemente hemos determinado la existencia de un

---

[8] In re Carreras y Suárez, *supra*, pág. 795.

[9] *Id.*

conflicto de intereses que requiere la imposición de sanciones cuando enfrentamos alguna circunstancia que impide que el abogado o abogada ejerza su función de representación de forma libre y adecuada. In re Belén Trujillo, 126 D.P.R. 743, 752 (1990). El Canon 21 contempla tres situaciones que debe evitar todo abogado para no incurrir en la representación de intereses encontrados, a saber, que en beneficio de un cliente, se abogue por aquello a lo que el letrado debe oponerse en cumplimiento de sus obligaciones para con otro cliente, situación que presupone la representación simultánea de dos clientes distintos, cuyos intereses se llegan a oponer; que un abogado acepte la representación de un cliente en asuntos que puedan afectar adversamente cualquier interés de un cliente anterior, la cual presupone la representación sucesiva de distintos clientes, cuyos intereses se llegan a oponer; **que un abogado acepte una representación legal, o que contiene en ella, cuando su juicio profesional pueda ser afectado por sus intereses personales**. In re Bonilla Rodríguez, 154 D.P.R. 684 (2001).

Estas manifestaciones del conflicto de intereses se pueden resumir en dos vertientes, una que recoge lo que constituye el conflicto de intereses personales y la más común, que hemos denominado "conflicto de obligaciones".[10]

---

[10] Existe un conflicto de obligación cuando hay representaciones simultáneas o sucesivas de clientes en las que los intereses de éstos están en conflicto con el deber de guardar confidencias que tiene el abogado con cada uno. En estos casos el abogado se enfrenta ante otro posible

In re Belén Trujillo, *supra*, pág. 754. El caso que hoy nos ocupa presenta una controversia relacionada a los conflictos de intereses personales, por lo que nuestra discusión se limitará a ese aspecto de la doctrina de intereses encontrados.

Como hemos discutido, el Canon 21 del Código de Ética Profesional impone un deber de lealtad absoluta que es posible mediante el ejercicio de un juicio independiente. La vertiente de conflicto de intereses personales sostiene que el conflicto existe cuando los intereses personales del abogado interfieren o pueden interferir con la representación adecuada y efectiva del cliente. In re Bonilla Rodríguez, *supra*, 694-695. En un caso donde se manifieste este tipo de conflicto, el abogado se encuentra frente a un dilema, pues su deber de representar al cliente de manera efectiva puede ser incompatible con la defensa de algún interés propio que el abogado también quiera, o tal vez deba, promover o defender. En la mayoría de los casos, la representación adecuada conlleva perjudicar los intereses personales del abogado. In re Belén Trujillo, *supra*, pág. 754 (1990); In re Toro Cubergé, *supra*, pág. 531; Liquilux Gas Corp. v. Berríos, Zaragoza, 138 D.P.R. 850 (1995). Por ello, la prohibición de asumir una

---

dilema: por un lado tiene con cada uno de sus clientes el deber de guardar confidencias y de representarlo adecuadamente y, por otro, la representación adecuada de un cliente posterior o simultáneo puede requerir la divulgación de confidencias del otro. In re Belén Trujillo, *supra*, pág. 754.

representación legal cuando ésta pueda verse afectada por sus expectativas o intereses personales intenta evitar que un abogado deje de realizar determinada acción de posible beneficio para su cliente en aras de beneficiarse personalmente. In re Belen Trujillo, *supra*; In re Pizarro Santiago, 117 D.P.R. 197 (1986); In re Martínez Rivera, 106 D.P.R. 239 (1977); Otano Cuevas *et als* v. Vélez Santiago *et als*, 141 D.P.R. 820,826 (1996); In re Toro Cubergé, *supra*; In re Palou Bosch, 148 D.P.R. 717, 724 (1999); In re Sepúlveda Girón, 155 D.P.R. 345, 356-357 (2001). Debo aclarar que el Canon 21 no solamente veda la representación legal de un cliente respecto al cual el abogado tiene intereses conflictivos en cuanto a bienes o dinero, sino que se extiende a cualquier tipo de interés encontrado.

El Canon 21 tiene un efecto que hemos calificado como "profiláctico", pues obliga todo abogado a **evitar** conflicto entre sus intereses personales y los de su cliente. Morell Corrada y Alcover García, *supra*, págs. 818-819. Una lectura de la letra del Canon 21 demuestra que la prohibición no sólo se refiere al conflicto de intereses actual, sino al aparente, al potencial y al futuro conflicto de intereses, de manera que lo que se proscribe es la **posibilidad** de un conflicto de intereses. Sánchez Rodríguez v. López Jiménez, 116 D.P.R. 172, 190 (1985); In re Avilés Cordero y Tosado Arocho, 157 D.P.R. 867, 871 (2002). En ese sentido, hemos resuelto que:

> …para imponer al abogado la obligación de renunciar a la representación… el conflicto no tiene

que estar establecido claramente; basta con que el conflicto sea potencial para que el abogado vulnere la lealtad absoluta que le debe a su cliente. La situación no varía por el hecho de que alguien crea que dicha posibilidad es, o no, altamente especulativa. Fed. Pesc. Playa Picúas v. U.S. Inds. Inc., 135 D.P.R. 303, 319 (1994); In re Bonilla Rodríguez, *supra*, 694- 695; In re Torres Viera, cita.

Anteriormente se ha recalcado que la responsabilidad de evitar el conflicto de intereses recae sobre el abogado. In re Palau Bosch, *supra*. Para determinar el posible conflicto de intereses, el abogado debe evaluar la existencia de circunstancias que llevan consigo **la semilla de un posible o potencial conflicto futuro**. Es decir, está vedado al abogado asumir la representación legal de clientes cuando resulta razonablemente anticipable un futuro conflicto de intereses, aun cuando sea inexistente al momento de la aceptación de la representación legal. In re Sepúlveda Girón, *supra*, págs. 356-357 (2001).[11] Así, ante un potencial conflicto de intereses, el deber del abogado es desligarse cuanto antes de la representación profesional que ostenta. In re Torres Viera, *supra*; In re Roldán González, 113 D.P.R. 238, 242-243 (1982). In re Bonilla Rodríguez, *supra*, 695. Inclusive hemos decretado que cuando inadvertidamente el abogado acepte una representación legal conflictiva, ante la señal de que los intereses del cliente estén encontrados con los intereses personales del abogado, éste deberá renunciar de inmediato la representación

---

[11] En In re Concepción Suárez, 111 D.P.R. 486 (1981), requerimos la renuncia de un abogado por existir una posibilidad de conflicto de intereses.

profesional.   In re Sepúlveda Girón, *supra*, págs. 356-357
(2001).

Hemos sido enfáticos en ejercer nuestra función
disciplinaria en el contexto de la potencialidad de
intereses conflictivos pues…

> En la interpretación de una norma de ética sobre
> la incompatibilidad de un profesional para intervenir
> en un acto por conflicto de intereses, un tribunal
> debe tener presente, que la norma, en su vigencia, no
> distingue, ni puede distinguir, entre los
> profesionales que en situación de conflicto tienen
> fortaleza para resistir la humana tentación de
> adelantar sus intereses personales, y los débiles de
> voluntad que sucumben en la oportunidad pecaminosa. In
> re Cancio Sifre, 106 D.P.R. 386, 395 (1977).

De acuerdo al carácter apremiante de nuestro poder
fiscalizador ante un posible conflicto de intereses,
nuestra intervención podrá ser provocada por los más leves
indicios de conducta prohibida.  Sabido es que todo miembro
de la profesión togada tiene "el deber de lucir puro y
libre de influencias extrañas a su gestión profesional", y
que "en el descargo de sus responsabilidades profesionales,
debe cuidarse de que sus actuaciones no den margen **a la más
leve sospecha**" de que promueve intereses suyos
potencialmente encontrados con los de su cliente.   In re
Pizarro Santiago, *supra*.   In re Roldán González, 113 D.P.R.
238, 242-243 (1982).  In re Bonilla Rodríguez, *supra*, pág.
695.   In re Palau Bosch, *supra*;  In re Avilés Cordero y
Tosado Arocho, *supra*, pág. 884;  In re Toro Cubergé, *supra*,
pág. 532;  In re Morell Corrada y Alcover García, *supra*,
pág. 811. Por ello, se ha relacionado el deber impuesto por
el Canon 38 con el deber impuesto por el Canon 21. In re

Torres Viera, *supra*.  En varias ocasiones hemos resuelto que dentro de los parámetros del Canon 21 cobra particular importancia el deber de los miembros de la profesión togada de evitar la apariencia de impropiedad en el desempeño de sus funciones profesionales:

> En todo caso, hemos de insistir en la importancia de la apariencia como elemento importante a ser ponderado y evaluado para despejar incertidumbres de licitud y propiedad.  Con este prisma hemos de adentrarnos en la compleja área ética del conflicto dimanante de intereses encontrados.  In re Carreras Rovira y Suárez Zayas, *supra*, págs. 784-785, 792.

El Canon 38 dicta las pautas que garantizan la preservación del honor y dignidad de la profesión:

> El abogado deberá esforzarse, al máximo de su capacidad, en la exaltación del honor y dignidad de su profesión, **aunque el así hacerlo conlleve sacrificios personales** y **debe evitar hasta la apariencia de conducta profesional impropia.** En su conducta como funcionario del tribunal, deberá interesarse en hacer su propia y cabal aportación hacia la consecución de una mejor administración de la justicia. **Tal participación conlleva necesariamente asumir posiciones que puedan resultarle personalmente desagradables pero que redundan en beneficio de la profesión** (…) (Énfasis nuestro.)

Como Foro regulador de la profesión legal, no podemos avalar situaciones de dudas o ambigüedad sobre la posibilidad de intereses encontrados en la gestión profesional de un abogado o una abogada.  Por eso, el criterio de apariencia de impropiedad debe ser utilizado para resolver las dudas que surjan sobre posible conflicto de intereses.  Después de todo, los abogados tenemos la obligación de precaver el conflicto de intereses, tanto en la realidad como en la apariencia. In re Carreras Rovira y

Suárez Zayas, *supra*; In re Rodríguez Torres, 104 D.P.R. 758, 765 (1976); In re Bonilla Rodríguez, *supra*, pág. 698.

El desempeño de la abogacía requiere en todo momento celo, cuidado y prudencia, pues "[c]ada abogado es un espejo en que se refleja la imagen de la profesión, [por lo que] éstos deben actuar con el más escrupuloso sentido de responsabilidad que impone la función social que ejercen". In re Fernández de Ruiz, 2006 T.S.P.R. 73; In re Gordon Melendez, 2007 T.S.P.R. 108. A base de esos criterios hemos señalado que "las dudas sobre cuestiones de ética profesional debe resolverlas el abogado con rigurosidad contra sí mismo". In re Valentín González, 115 D.P.R. 68, 73 (1984); In re Carreras Rovira y Suárez Zayas, *supra*; In re Toro Cubergé *supra*, págs. 535-536; In re Belén Trujillo, *supra*; Sánchez Rodríguez v. López Jiménez, 116 D.P.R. 172 (1985); In re Palou Bosch, *supra*, pág. 725. Este curso de acción no tiene que producirse siempre ante conducta antiética, pues "puede haber situaciones que escapen a la reglamentación y en las que para evitar aun la apariencia de conducta impropia, el buen juicio aconseje la abstención", aunque ese proceder limite o sacrifique beneficios personales. In re Carrera Rovira y Suárez Zayas, *supra*, pág. 785.

Cabe reiterar que la apariencia de impropiedad puede ser muy lesiva al respeto de la ciudadanía por sus instituciones de justicia y por la confianza que los clientes depositan en sus abogados. Asimismo, la apariencia

de conducta impropia puede tener un efecto dañino sobre la imagen, la confianza y el respeto del público por su Gobierno, igual que la verdadera impropiedad ética. In re Sepúlveda Girón, *supra*, pág. 361. Es por eso que los abogados deben asegurarse que su conducta no ha sido influida por intereses encontrados. In re Rojas Lugo, 114 D.P.R. 687 (1983).

Cuando un abogado lleva a cabo una transacción de negocios con su cliente, se impone una auscultación minuciosa, pues el deber de lealtad del abogado que comercia con su cliente puede verse disminuido ante una oportunidad de lucro personal. Anteriormente hemos resaltado que **las transacciones comerciales con un cliente son inherentemente sospechosas**, pues:

> …no sólo el juicio profesional independiente del abogado puede ser seriamente afectado por sus intereses personales en la transacción, sino que cada vez que un abogado realiza una transacción con su cliente, se plantea la posibilidad de que el letrado utilice sus destrezas legales y su posición para aprovecharse del cliente, utilizando, por ejemplo, su influencia o la información confidencial obtenida para su beneficio personal.[12] In re Morell Corrada y Alcover García, *supra*, págs. 805-806.

Este escepticismo nos lleva a escrutar acuciosamente las transacciones entre abogados y clientes para determinar si se tratan de transacciones utilizadas por abogados que aprovechan su posición para elaborar esquemas para su propio beneficio y contra los intereses de sus clientes. Morell Corrada y Alcover García, *supra*, pág. 818-819. En el

---

[12] Nótese que nuestra preocupación no se limita a la divulgación o uso de información confidencial.

pasado hemos condenado el que los abogados tomen ventaja de su posición para beneficiarse económicamente. In re Torres Viera, *supra*. In re Pizarro Santiago, 117 D.P.R. 197 (1986). En Nassar Rizek, *supra*, pág. 375, pusimos de manifiesto la fuerza permanente que de ordinario genera el abogado frente a su cliente. Los principios éticos de lealtad, decoro, dignidad e integridad profesional del abogado prohíben que éste se aproveche de esa posición.

Lo anterior es particularmente cierto cuando el cliente es una entidad gubernamental. Hemos declarado que:

> Pocas cosas son tan destructivas de la integridad gubernamental y de la confianza pública en los abogados y en las instituciones de gobierno que **la explotación real o aparente de la relación profesional con algún ente del Estado para fines personales**. In re Toro Cubergé *supra*, pág. 536. (Énfasis en el original.)

Ante un cuadro como el del caso de autos, debemos reiterar que este Tribunal reprocha la aparente, posible o real explotación de la relación profesional con una entidad pública para beneficios personales. In re Morell Corrada y Alcover García *supra*, pág. 822. Cuando un abogado que labora para una agencia gubernamental utiliza la información e influencias de su posición para desarrollar una relación lucrativa con su cliente, se pone en entredicho la transparencia que debe caracterizar la ejecutoria gubernamental en una democracia. Los abogados que representan al interés público tienen la responsabilidad de evitar que su criterio profesional pueda ser afectado por intereses personales. In re Morell Corrada

y Alcover García, *supra*, pág. 822. Nuestras pasadas expresiones han puntualizado la vulnerabilidad que caracteriza a esta singular relación abogado-cliente.

> …los abogados deben ser particularmente cuidadosos en sus labores profesionales y en su relación con la cosa pública, además de ser siempre conscientes de que la fe en la Justicia es uno de los factores determinantes sobre los cuales descansa la convivencia social. In re Toro Cubergé, *supra*, 535-536 (1996).

Precisamente, en In re Toro Cubergé, *supra*, págs. 532-533, y en In re Morell Corrada y Alcover García, *supra*, pág. 807, abordamos este asunto en el contexto de transacciones de negocio entre el abogado y una entidad gubernamental. La norma que allí establecimos va dirigida a prohibir, de ordinario, las transacciones comerciales entre un abogado y su cliente, cuando éstas tienen el potencial de afectar el juicio profesional independiente del abogado o cuando éstas puedan diluir el deber de lealtad y fidelidad que se le debe al cliente. En ambas ocasiones reconocimos que el conflicto de interés puede surgir, no sólo de la participación personal del abogado en el negocio, sino incluso por virtud de una transacción comercial entre un cliente y una corporación en la que el abogado tuviese un interés o con la que estuviese relacionada.[13]

---

[13] La ficción legal que tipifica la corporación como persona jurídica distinta de sus accionistas… no [es suficiente] para satisfacer la norma sobre incompatibilidad… La ética es una en su integridad, indemne al fraccionamiento que en ley separa la corporación de su accionista. In re Cancio Sifre, 106 D.P.R. 386, 398 (1977).

El problema central en dichos casos radicó en que los abogados nunca le divulgaron a las agencias respectivas que estaban involucrados en las transacciones de negocios de los entes corporativos con los cuales las agencias contrataron y en que las agencias no tuvieron la oportunidad de asesorarse independientemente. In re Toro Cubergé, supra, pág. 534; En atención a esto, adoptamos lo dispuesto por la American Bar Association en sus reglas modelo de conducta y establecimos los requisitos con los cuales debe cumplir un abogado para orientar debidamente a su cliente, permitirle analizar cabalmente la transacción y brindarle la libertad necesaria para determinar si accede a la misma. Si bien consideramos que éstos requisitos evitan la desinformación del cliente y garantizan su libertad de contratación, en In re Morell Corrada y Alcover Gracía, *supra,* aclaramos **que las pautas establecidas no son meramente requisitos *pro forma*.** Por eso entiendo que el cumplimiento de los requisitos pautados en In re Morell Corrada, *supra*, no puede evaluarse en abstracto. Por el contrario, debemos ubicarlos en el contexto amplio de nuestro ordenamiento deontológico, pues a fin de cuentas la ética es una en su integridad, In re Cancio Sifre, *supra*, pág. 398. Lo anterior es particularmente cierto cuando se refiere a la importancia de evitar la apariencia de impropiedad y conflicto en la relación entre el abogado y su cliente cuando éste es una entidad pública.

La naturaleza particular de los hechos que confrontamos en In re Toro Cubergé, supra e In re Morell Corrada y Alcover Gracía, supra, no nos requirió indagar en las distintas implicaciones de una transacción de negocios entre un abogado y un cliente privado, y las transacciones entre un abogado y su cliente cuando éste es una instrumentalidad pública. El cliente del abogado que es contratado por el gobierno es, en esencia, el interés público. Por eso, en esa situación, los intereses envueltos tienen una envergadura que va más allá de los confines de la dirección de turno de la agencia. Cuando la transacción es puramente privada, los requisitos de divulgación y asesoramiento independiente subsanan cualquier desigualdad de información que pueda haber entre el abogado y su cliente. Pero cuando los intereses públicos están de por medio, la apariencia se torna imperante pues lo que está de por medio es la legitimidad misma de nuestro ordenamiento político. El mero cumplimiento de los requisitos jurisprudenciales antes expuestos no rectifica, ante la ciudadanía, la posible sospecha de conducta antiética, por lo que el abogado debe tomar medidas adicionales para mantener la consabida confianza del público en sus instituciones.[14] En fin, los requisitos establecidos por la

---

[14] A manera de guía, podemos establecer una analogía entre los mecanismos que debe seguir el abogado que representa al Gobierno y las protecciones que la Asamblea Legislativa ha elaborado en la Ley de ética gubernamental para mantener una apariencia de conducta ética. En sus artículos 3.3 y 3.7, dicha Ley establece unos períodos de tiempo como medidas profilácticas para evitar el posible conflicto de

A.B.A., según mi criterio, no deben aplicarse indistintamente, sino de acuerdo a los intereses involucrados.[15]

Por otra parte, al interpretar el alcance del Canon 21 en cuanto concierne a la relación abogado cliente, hemos dejado claro que en nuestro ordenamiento jurídico, "la autonomía del cliente no se extiende al punto de permitirle que acepte mediante la manifestación de su consentimiento voluntario e informado, la representación legal cuando existe alguna posibilidad de conflicto de intereses. Nuestro Canon 21 lo prohíbe expresamente." In re Carreras y Suárez, *supra*, pág. 793.

Además, el Canon 26, que versa sobre los derechos y limitaciones en la relación con los clientes dispone que:

> Ningún abogado está obligado a representar a determinado cliente y es su derecho el aceptar o rechazar una representación profesional…**El abogado debe obedecer siempre a su propia conciencia y no la de su cliente.** (Énfasis nuestro.)

En Nassar Rizek v. Hernández, 123 D.P.R. 360, 369-370 (1989) abundamos sobre la naturaleza del contrato entre el abogado y el cliente, y a la luz de la doctrina vigente explicamos que a pesar de que el contrato de asistencia

---

intereses personales. Si bien no estoy proponiendo que estas disposiciones legales apliquen directamente al abogado de la práctica privada que es contratado por el gobierno para llevar a cabo determinadas funciones públicas, las mismas pueden servir de guía para los abogados en situaciones como la de autos. Véanse 3 L.P.R.A. secs. 1823 y 1827(b).

[15] Véase Mari Carmen Ramos de Szendrey, Conducta Profesional, 66 Rev. Jur. U.P.R. 551 (1997), en especial la discusión

profesional de abogado es una variante del contrato de arrendamiento de servicios plasmado en el artículo 1434 del Código Civil, 31 L.P.R.A. sec. 4013, los tratadistas lo incluyen particularmente dentro de los contratos de prestación de servicios propios de las profesiones y de las artes liberales:[16]

> De acuerdo con esta visión, el arrendamiento de servicios de una profesión liberal es aquel donde un profesional pone a disposición de la persona una actividad intelectual o técnica retribuida. **Su característica principal es la forma autónoma e independiente en que el profesional, poseedor del título habilitante, la ejerce.**[17] (Énfasis nuestro.)

En consideración a esto y al hecho de que "la relación entre abogado y cliente responde en gran medida a las inexorables exigencias éticas, muy particulares de esta profesión", hemos declarado que el contrato de servicios profesionales de abogado constituye un contrato de naturaleza *sui generis*. López de Victoria v. Rodríguez, 113 D.P.R. 265, 268 (1982).[18] De manera que:

---

que la autora expone en las páginas 566-576 sobre las implicaciones del caso de In re Toro Cubergé, *supra*.

[16] Para formular nuestra postura, nos nutrimos del trabajo de J. Castán Tobeñas, Derecho Civil español, común y foral, Madrid, Ed. Reus, 1985, T. 4, pág. 466; J. Puig Brutau, Fundamentos de Derecho Civil, Barcelona, Ed. Bosch, 1982, T. II, Vol. 2, pág. 430; M. Albaladejo, Comentarios al Código Civil y compilaciones forales, Madrid, Ed. Rev. Der. Privado, 1986, T. XX, Vol. 2, pág. 1 et seq.; M. Albaladejo, Derecho Civil, Barcelona, Ed. Bosch, 1983, T. II, Vol. 1, pág. 281.

[17] M. Albaladejo, Comentarios al Código Civil y compilaciones forales, op cit, pág. 27.

[18] En cuanto a la influencia de la ética en la relación contractual del abogado y su cliente dijimos que:

Es definitivamente cierto que estos valores éticos operan como elementos limitantes a la voluntad de los contratantes. En este sentido, queda cualificado el principio de libertad y autonomía de las partes consagrado en el Art. 1207 del Código Civil, 31 L.P.R.A. sec. 3372, respecto de que éstas puedan realizar cualquier convenio siempre y cuando sea conforme a la ley, a la moral y al orden público. En el contexto de la relación abogado-cliente, el aspecto moral que restringe la libertad de contratación es un poco más sensitivo y abarcador… Esta serie de comportamientos particulares existe en cualquier etapa de la relación abogado-cliente. Nassar Rizek v. Hernández, *supra*, págs. 369-370.

Como dijéramos en In re Bonilla Rodríguez, *supra*, pág. 697-698, no podemos permitir el menoscabo al cumplimiento riguroso de los Cánones de ética al condonar la conducta del abogado bajo la tesis de que su cliente le mantiene confianza, pues renunciaríamos y entregaríamos la jurisdicción disciplinaria de este foro a criterios individuales, sabios o no, sacrificando intereses públicos de alta calidad.

### III

El querellado, anticipando nuestra aplicación de las doctrinas de In re Toro Cubergé, *supra*, e In re Morrell Corrada y Alcover García, *supra*, alega que cumplió con los

---

El contrato se encuentra inmerso en normas deontológicas [que] impregnan la relación contractual en abono de un interés público superior que puede trascender el interés exclusivo de las partes. Como observa acertadamente Adolfo E. Parry, las leyes reglamentarias de la profesión de abogado 'participan del carácter de las de orden público, desde que reposan en concepciones consideradas por el Legislador como esenciales a la existencia de la sociedad: garantizar... la competencia y probidad de un servicio público auxiliar de la administración de la justicia'. Ética de la Abogacía, Buenos Aires, Ed. Jurídica Argentina, 1940, T. 1, pág. 16. Nassar Rizek v. Hernández, *supra*, págs. 369-370.

cánones de ética profesional y con la jurisprudencia interpretativa, pues no utilizó información confidencial de la ADS; divulgó en todo momento la existencia de intereses personales en la transacción; la ADS contó con asesoría legal independiente; y la ADS se benefició de una transacción que no fue injusta ni irrazonable. En efecto el Comisionado Especial reconoció que así fue. No obstante, concluyó, a mi entender correctamente, que el mero cumplimiento con las doctrinas de Toro, *supra*, y Morell, *supra*, no fue suficiente.

No podemos pasar por alto el hecho de que el querellado era socio administrador y propietario del Bufete que fungió como representante legal de una agencia gubernamental, la ADS, y que desde que el Bufete comenzó su contrato de servicios profesionales el querellado comenzó a elaborar un esquema corporativo para lucrarse de las necesidades de su cliente (el Plan), basado en el conocimiento obtenido por razón de esa relación profesional. El querellado se encontraba, sin dudas, en una posición ventajosa para diseñar una entidad que cumpliera a cabalidad con las necesidades de su cliente. Desde antes de la adjudicación del contrato, ya el querellado utilizaba sus influencias como representante legal de la ADS para promover dentro de las altas esferas del gobierno el esquema corporativo que diseñaba. Inclusive, durante su incumbencia como representante legal de la ADS, formó parte de un comité interno de la agencia

que se encargaría de garantizar la continuidad y consistencia en la implementación del Plan. Además, el querellado y el personal de su Bufete se reunieron en varias ocasiones con la ADS para discutir los pormenores del Plan y un modelo del contrato que debía firmarse entre la ADS y la entidad que fuera contratada para implementar el Plan. Posteriormente, el Bufete y la ADS celebraron reuniones para viabilizar la propuesta de trabajo que sometió el consorcio del querellado, quien era accionista mayoritario del mismo.

El potencial conflicto de intereses era tan aparente que la misma ADS sugirió que se contratara un abogado externo para negociar los términos del contrato y que el Bufete renunciara a la representación legal directa, pues era a la vez asesor legal de la ADS y parte del consorcio. A pesar de que el Bufete en efecto renunció a la representación legal directa, la asumió indirectamente mediante subcontrato a través de PRIME. Además, consta en los hechos que el querellado no se abstuvo de participar en el proceso de contratación y negoció importantes cláusulas sobre partidas económicas y servicios. El querellado participó en el proceso de facturación y fue miembro de la Junta de Directores de PRIME. Además de sus dividendos como accionista mayoritario, el querellado devengaba un sueldo y estipendios para gastos de automóvil y misceláneos. Todo esto apunta a que el querellado no mantuvo la distancia necesaria entre su persona como propietario del Bufete y

propietario de PRIME y su persona como representante legal subcontratado de la ADS, para no dar margen a sospechas de intereses encontrados.

Su lealtad quedó fraccionada entre los múltiples roles que desempeñaba. Como miembro del directorio de PRIME, le debía lealtad a ésta y a sus accionistas; como accionista mayoritario de dicha corporación se lucraba personalmente; como socio propietario y administrador del Bufete, prometió lealtad a PRIME y como subcontratista y componente del consorcio, pactó completa lealtad a la ADS. Es indudablemente aparente la potencialidad de un conflicto de intereses.

El hecho de que el querellado no hubiera divulgado secretos y confidencias no era justificación para asumir una representación legal posiblemente conflictiva. Ya hemos dicho que un abogado no puede salvar el conflicto de intereses aduciendo como justificación que no habrá de utilizar las confidencias o secretos de un cliente en perjuicio de éste. In re Carreras Rovira y Suárez Zayas, *supra*, pág. 784. Tampoco exime al querellado de responsabilidad el hecho de que la información de la ADS no fuera confidencial, pues la información la recibió de primera mano por ser el asesor legal de dicha agencia, lo que como mínimo crea la apariencia de que se aprovechó de su posición para ejercer influencias y crear un consorcio a la medida de las necesidades de la ADS. Esta apariencia aporta al detrimento de la confianza de la ciudadanía en su

Gobierno y en nuestro ordenamiento jurídico. Avalar esta conducta lesiona de igual manera la confianza del público en nuestra ejecutoria.

Tampoco libera de responsabilidad al querellado el haber cumplido con su deber de divulgar al cliente las circunstancias de su relación como requiere la doctrina adoptada en In re Morell Alcover, *supra*. El abogado es dueño de su propia conciencia y es su deber indelegable cumplir con los Cánones de su profesión. Como indiqué anteriormente, la jurisprudencia es clara al establecer que la autonomía de la libertad en materia de contrato de servicios profesionales entre abogado y cliente, esta ceñida por la deontología. Cuando el gobierno es el cliente, el abogado debe ir más allá del cumplimiento *pro forma* de unos requisitos jurisprudenciales, y debe evaluar si el acto que pretende llevar a acabo lleva consigo la apariencia de impropiedad.[19] Un cliente no puede consentir a que su representante lesione los postulados que rigen su profesión y actúe de manera aparentemente impropia.

Este Tribunal ha desaprovechado la oportunidad que le brinda este caso para interpretar el Canon 21 en el contexto de contratos con entidades gubernamentales.

---

[19] Hay jurisdicciones estatales en Estados Unidos que han concluido que cuando el interés público está involucrado, un abogado no puede representar al cliente cuando hay conflicto de intereses, aun cuando éste consienta. In re A and B, 209 A.2d 101 (1965); Graf v. Frame, 352 S.E.2d 31 (1986); State ex rel. Morgan Stanley & Co., Inc. v. MacQueen, 416 S.E.2d 55 (1992); Ahto v. Weaver, 189 A.2d 27 (1963); City of Little Rock v. Cash, 644 S.W.2d 229 (1982).

Aunque entiendo que en ese contexto la conducta del querellado violó el Canon 21, no habiéndose pautado anteriormente la naturaleza particular de ese contrato ni las consideraciones éticas que lo rigen, aplicaría la normativa propuesta de manera prospectiva y no penalizaría al querellado por su incumplimiento. No obstante, de acuerdo a los hechos expuestos y a una interpretación conjunta de los Cánones 21 y 38, resolvería que el querellado incurrió en conducta que creó la apariencia de impropiedad al levantar las sospechas de un posible conflicto de intereses, y censuraría enérgicamente al Lcdo. Carlos Rivera Vicente por su incumplimiento con el Canon 38.

Liana Fiol Matta
Jueza Asociada