EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| In re: <br><br> Max Olivera Mariani | 2008 TSPR 58 <br><br> 173 DPR _____ |

Número del Caso: CP-2002-3


Fecha: 3 de abril de 2008


Oficina del Procurador General:

                Lcdo. Kenneth Pamias Velázquez
                Subprocurador General

                Lcda. Yvonne Casanova Pelosi
                Lcda. Miriam Soto Contreras
                Procuradora General Auxiliar


Abogados de la Parte Querellada:

                Lcdo. Guillermo Figueroa Prieto
                Lcda. María Elena Vázquez Graziani
                Lcdo. Pedro Jiménez


Abogado de la Oficina del Contralor del E.L.A. de P.R.:

                Lcdo. César N. Cordero Rabell

Materia: Conducta Profesional

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

INTEGRACIÓN DE SALA ESPECIAL

ORDEN

San Juan, Puerto Rico, a 3 de abril de 2008.

Debido a la no intervención del Juez Asociado señor Rebollo López y la Juez Asociada señora Rodríguez Rodríguez, se constituye una Sala Especial integrada por el Juez Presidente señor Hernández Denton, el Juez Asociado señor Rivera Pérez y la Jueza Asociada señora Fiol Matta, para entender en el caso núm. CP-2002-03, In re: Max Olivera Mariani.

Lo decretó y firma.

Federico Hernández Denton
Juez Presidente

CERTIFICO:

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

In re:

   Max Olivera Mariani                 CP-2002-3

Sala Especial Integrada por el Juez Presidente señor Hernández Denton, el Juez Asociado señor Rivera Pérez y la Juez Asociada señora Fiol Matta

PER CURIAM

San Juan, Puerto Rico, a 3 de abril de 2008.

Nos corresponde determinar si incurrió en apariencia de conducta impropia un abogado al negociar, en su carácter de presidente de una entidad privada con fines de lucro, un contrato con el Gobierno a favor de dicha compañía. Por entender que no se presentó prueba clara, robusta y convincente que nos permita concluir que la conducta del querellado se apartó de las normas éticas que rigen la profesión de la abogacía, ordenamos la desestimación y el archivo de la querella presentada en contra de éste.

I

El presente caso es producto de un largo y complejo trámite procesal que comenzó en diciembre de 1996 cuando la anterior Contralor del Estado Libre Asociado de Puerto Rico, Hon. Ileana Colón Carlo, cursó una carta al entonces Juez Presidente de este Tribunal, Hon. José A. Andréu García. En su misiva, la Contralor sostuvo que de una auditoría especial de las operaciones fiscales del Departamento de Salud, específicamente en el Hospital de Área de Carolina, se desprendían varias irregularidades alegadamente cometidas durante el proceso de contratación y prestación de servicios médico-hospitalarios por parte del querellado Max Olivera Mariani, quien presidía y era el único accionista de la compañía HMCA, Inc. (en adelante, HMCA).

HMCA había sido contratada por el Departamento de Salud en 1982 para operar y administrar el aludido hospital en Carolina. Posteriormente, el Departamento de Salud y HMCA acordaron enmendar el contrato para ampliar los servicios que la compañía prestaba en el mencionado hospital y, además, incluir la operación y administración por ella de un segundo hospital ubicado en Fajardo. Es, precisamente, sobre los sucesos relacionados con la negociación y contratación de esta enmienda que la Contralor basó su queja. En particular, la Contralor señaló que para obtener el financiamiento requerido durante la transacción Olivera Mariani hizo falsas representaciones

al presentar documentación que había sido dejada sin efecto.[1]

Remitida la queja a Secretaría para su tramitación ordinaria y tras numerosas comparecencias de Olivera Mariani, de la Oficina del Contralor y del Procurador General, ordenamos a éste último la presentación de la querella correspondiente. En cumplimiento con lo anterior, el Procurador General formuló una querella en contra de Olivera Mariani en la que sostuvo que éste "pudo haber violentado" el Canon 38 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX.[2] Olivera Mariani contestó la querella y negó las imputaciones en su contra.

_____

[1] La Contralor también le imputó conducta impropia al hijo del querellado, el Lcdo. Gabriel Olivera Magraner, cuya intervención se limitó a emitir una opinión legal sobre los acuerdos relacionados con el financiamiento. No obstante, tras examinar las alegaciones de las partes al respecto, mediante resolución del 3 de noviembre de 2000 ordenamos el archivo de la queja presentada contra el Lcdo. Olivera Magraner.

[2] Cabe señalar que el Procurador General presentó la referida querella luego de solicitarnos, mediante moción informativa, que reconsideráramos nuestra decisión de ordenar la presentación de la misma. Inicialmente, en el informe que el Procurador General nos rindió, éste expresó que no contaba con evidencia suficiente para concluir que el querellado había incurrido en conducta antiética. Dada la postura de la Oficina del Contralor, le ordenamos al Procurador General que suplementara su informe. Aunque ello redundó en que en determinado momento el Procurador rindiera un informe enmendado apoyando las imputaciones expuestas en la queja de la Contralor, mediante la mencionada moción informativa éste reafirmó su posición original. Aún así, considerada la alegación de la Oficina del Contralor sobre la conducta antiética del querellado, le ordenamos al Procurador General que presentara la querella.

Posteriormente, designamos al Hon. Ángel F. Rossy García para que, en calidad de Comisionado Especial, presidiera la vista evidenciaria, recibiera y aquilatara la prueba y nos rindiera un informe con sus determinaciones de hecho y su recomendación. A esos fines, el Comisionado Especial ha formulado su informe, en el cual determinó lo siguiente:

> Un análisis y evaluación de la prueba que fue aportada en el proceso nos obliga a concurrir con el criterio de la Oficina del Procurador General expresado en su Moción en Cumplimiento de Orden a los efectos de que en el caso que nos ocupa nos encontramos ante una total "ausencia de evidencia que sugiera o demuestre conducta intencional, impropia o deshonrosa del querellado mientras realizaba gestiones privadas, no como abogado, que lo hagan indigno de pertenecer al foro". Informe del Comisionado Especial, pág. 33.

> [...]

> [L]a total ausencia de prueba que permita inferir y menos concluir proceder indebido por parte del licenciado Olivera Mariani desviste de todo mérito la querella que nos ocupa y conduce a un solo curso decisional, recomendar su desestimación y archivo en todas sus partes. *Id.*, pág. 40.

Expongamos el trasfondo fáctico según surge de los hechos estipulados por las partes y de las determinaciones del Comisionado Especial.

A

El 1 de julio de 1982 HMCA, representada por Olivera Mariani, y el Departamento de Salud, representado por su Secretario, el Dr. Jaime Rivera Dueño, suscribieron un contrato mediante el cual acordaron privatizar la

administración y operación del Hospital de Área de Carolina, conocido como el Hospital Federico Trilla. Mediante el referido contrato, HMCA se obligó, como contratista independiente, a prestar servicios de nivel secundario[3] a pacientes médico-indigentes de Carolina, Trujillo Alto, Loíza y Canóvanas. A cambio de ello, recibiría un pago anual, más las ganancias percibidas producto del uso de las facilidades hospitalarias para atender pacientes privados. El contrato tendría una vigencia de diez años, sujeto a la disponibilidad de fondos al comienzo de cada año. De esta manera, el pago anual a HMCA se negociaba anualmente por adelantado.

A principios de 1987, HMCA solicitó al Departamento de Salud un aumento de los fondos para el 1988, lo que implicaba un presupuesto anual de $14.5 millones para dicho año fiscal. El entonces Secretario del Departamento de Salud, Dr. Luis Izquierdo Mora, contestó la solicitud de HMCA por escrito, indicando que la agencia había aprobado un presupuesto ascendente a $12.5 millones. Ante tales circunstancias, HMCA y el Departamento de Salud entablaron

---

[3] Según surge del expediente, para la fecha de los hechos pertinentes al caso de autos, la organización de los servicios de salud se clasificaba según el nivel de complejidad. El nivel primario de servicio consistía en tratamiento ambulatorio o de naturaleza preventiva, disponible típicamente en los centros de diagnóstico y tratamiento municipales. El nivel secundario comprendía servicios de hospitalización rutinaria, ofrecidos de ordinario en los hospitales de área. Finalmente, el nivel terciario se refería a servicios especializados, disponibles usualmente en los hospitales regionales.

negociaciones a mediados de julio de 1987 con el propósito de llegar a un acuerdo.

Para esa época, el Hospital Sub-Regional de Fajardo, el cual se encontraba bajo la administración privada de la Corporación de Servicios Médico-Hospitalarios de Fajardo (en adelante, CSMHF), cuyo propietario era el Dr. Carlos Lopategui, confrontaba una situación precaria ya que dicha compañía se había acogido a la Ley de Quiebras. Este hospital brindaba servicios a los pacientes médico-indigentes de Fajardo, Ceiba, Luquillo, Río Grande, Vieques y Culebra. La deuda de CSMHF por la operación del hospital excedía los $8 millones.

Dado que la situación económica inestable de CSMHF ponía en peligro la oferta de servicios de salud a los pacientes médico-indigentes de la región, el Departamento de Salud contempló concederle a HMCA el aumento solicitado por ésta para la administración del Hospital de Área de Carolina, a cambio de que dicha compañía prestara servicios terciarios en ese hospital, adquiriera la CSMHF y asumiera la operación y administración del Hospital de Fajardo. Las partes emprendieron una serie de negociaciones al respecto, las cuales culminaron el 24 de septiembre de 1987 con la aprobación de una enmienda al contrato original de 1982 –la Enmienda H– mediante la cual, efectivamente, HMCA se comprometía a prestar servicios terciarios en el Hospital de Área de Carolina a cambio de un aumento mensual de $175,000 por parte del Departamento de Salud y de la

Administración de Facilidades y Servicios de Salud (AFASS), más la extensión de la vigencia del contrato por cinco años adicionales, hasta 1997.

Durante la negociación, HMCA llegó a un acuerdo con el Dr. Lopategui para la compra de las acciones de CSMHF. Antes de consumar la transacción que dio lugar a la Enmienda H, el Secretario de Salud informó por escrito a Olivera Mariani que aprobaría la misma sujeto a las siguientes condiciones, las cuales HMCA aceptó: (1) que la Corte de Quiebras impartiera su aprobación al traspaso de las acciones de CSMHF a HMCA; (2) que HMCA pagara por completo las deudas de CSMHF; y (3) que CSMHF desistiera de todos los pleitos judiciales que había instado contra el Departamento de Salud y el Gobierno. Las partes acordaron mantener el presupuesto anual asignado al Hospital de Fajardo que estuviera vigente en ese momento.

Por su parte, HMCA condicionó su participación en el negocio a que el Departamento de Justicia expresara su aprobación del mismo. Debido a lo anterior, semanas antes de la firma de la Enmienda H, el entonces Secretario de Justicia, Lcdo. Héctor Rivera Cruz, emitió una opinión en la que sostuvo que la transacción propuesta por las partes se ajustaba a derecho. El Secretario expresó que le correspondía al Departamento de Salud prestar su consentimiento al negocio, si entendía que éste era beneficioso para el interés público. Además de dicha opinión, las partes sostuvieron una reunión en el

Departamento de Justicia con el propósito de que éste ofreciera asesoramiento sobre la transacción. En la reunión participaron el propio Secretario de Justicia, el Subsecretario de Justicia, el Secretario Auxiliar de Asesoramiento, el Secretario de Salud, el asesor legal de éste, Olivera Mariani y su asesor legal, el Lcdo. José Trías Monge. Durante la reunión se explicaron los detalles de la transacción, la cual no fue objetada por el Departamento de Justicia.

Afinados los términos del acuerdo y como parte de la negociación, HMCA llevó a cabo los trámites necesarios para obtener el financiamiento requerido para la transacción, el cual consistió en una emisión de bonos de la Autoridad para el Financiamiento de Facilidades Industriales, Médicas, para la Educación y Control de Contaminación Ambiental de Puerto Rico. La mensualidad adicional de $175,000 resultante de la Enmienda H constituiría la fuente de pago de la emisión. A tono con lo anterior, las partes suscribieron un acuerdo de cesión a favor de la entidad Prudential-Bache Capital Funding Puerto Rico, Inc. (en adelante, Pru-Bache), mediante el cual HMCA le cedió a ésta el derecho a recibir del Departamento de Salud y de la AFASS el mencionado pago mensual de $175,000. En esta cesión el Departamento de Salud y la AFASS se comprometieron a pagar la referida mensualidad directamente a la cesionaria Pru-Bache, independientemente de que HMCA prestara los servicios contratados por el Departamento de

Salud.    Tanto la Enmienda H como el contrato de cesión fueron remitidos al Secretario de Hacienda y a la Oficina de Presupuesto y Gerencia por parte del Secretario de Salud.

Seis meses después de la firma de la Enmienda H, el Lcdo. Lino Saldaña, asesor legal de la Fortaleza, cursó una misiva al Lcdo. Trías Monge en la cual le indicó varios señalamientos que, a su juicio, implicaban que la referida enmienda era nula.    El Lcdo. Saldaña explicó que la Enmienda H extendía la vigencia del contrato hasta 1997, lo cual alegadamente era contrario a un estatuto vigente en ese momento.[4]    Por tanto, sugirió rescindir la enmienda y sustituirla por una idéntica, cuya vigencia no excediera del 30 de junio de 1992, que era la fecha de expiración del contrato suscrito originalmente entre HMCA y el Departamento de Salud.    Inicialmente, HMCA, por conducto del Lcdo. Trías Monge, accedió a evaluar la modificación propuesta a la Enmienda H a los efectos de reducir el término de su vigencia hasta el 1992.    Ante la posibilidad de que el mencionado cambio fuera efectuado, el Secretario de Salud firmó los documentos correspondientes.

_____

[4] Se trataba de la Ley para Reglamentar la Contratación entre el Gobierno e Intereses Privados para la Administración y Operación de Facilidades de Salud Gubernamentales, Ley Núm. 103 de 12 de julio de 1985, que fue derogada por la Ley Núm. 190 de 5 de septiembre de 1996.    A juicio del Lcdo. Saldaña, las disposiciones de dicho estatuto eran aplicables a la Enmienda H.    No obstante, según las estipulaciones de hechos que sometieran el querellado y el Procurador General, las partes nunca llegaron a un acuerdo sobre el asunto porque el contrato original entre HMCA y el Departamento de Salud fue suscrito antes de la aprobación de la referida ley.

Sin embargo, según surge de los hechos estipulados por las partes, posteriormente HMCA descartó la posibilidad de aceptar la modificación propuesta, debido a que la misma no le permitiría cumplir con los compromisos económicos contraídos con los dos hospitales. De esta manera, el Secretario de Salud decidió honrar el compromiso original con vigencia hasta el 1997, según pactado en la Enmienda H. Conforme a la prueba creída por el Comisionado Especial, éste fue el documento que se sometió durante las negociaciones para obtener el financiamiento. Fue, además, el documento que se inscribió en los archivos del Departamento de Salud y el que utilizaron las partes en los distintos pleitos judiciales relacionados con el caso de autos.[5]

Aunque el término de vigencia de la Enmienda H permaneció inalterado, en respuesta a uno de los señalamientos del Lcdo. Saldaña, HMCA, el Departamento de Salud y Pru-Bache acordaron rescindir el contrato de cesión

---

[5] Cabe señalar que en el caso HMCA P.R., Inc. v. Ileana Colón Carlo, FPE89-0623, instado ante la Sala de Carolina del entonces Tribunal Superior, la Oficina del Contralor estuvo representada por un bufete de abogados del cual el Lcdo. Saldaña era socio. Durante los trámites de ese caso, los abogados de la Oficina del Contralor sometieron la Enmienda H suscrita el 24 de septiembre de 1987 y con vencimiento en 1997 como parte de los documentos, representando que ese era el acuerdo que vinculaba a las partes.

Conviene añadir que en julio de 1997, varios meses después que la Contralor presentara la referida queja disciplinaria, la Oficina del Contralor certificó que en mayo de 1997 había dispuesto del contrato originalmente suscrito por las partes en 1982, con sus enmiendas y anejos, por éste haber perdido su utilidad.

firmado anteriormente, liberando así al Departamento y a la AFASS de la obligación de pagarle directamente a Pru-Bache la mensualidad de $175,000 independientemente de que HMCA prestara los servicios pactados. De este modo, las partes suscribieron un segundo contrato de cesión que sólo comprometía al Departamento de Salud y a la AFASS frente a HMCA. El contrato aclaraba que HMCA y Pru-Bache podían acordar entre sí que el Departamento de Salud pagara la mensualidad directamente a Pru-Bache a través de una cesión ordinaria, lo cual efectivamente llevaron a cabo. El nuevo acuerdo relevó al Departamento de Salud y a la AFASS de responsabilidad directa frente a Pru-Bache, entidad que sólo recibiría los pagos provenientes de las referidas agencias en calidad de agente pagador del bonista. Los pagos estarían sujetos al cumplimiento por parte de HMCA de sus obligaciones.

Un tiempo después de pactada la Enmienda H, surgieron desacuerdos entre las partes que generaron una fuerte polémica pública y dieron lugar a que se presentaran diversos pleitos civiles, tanto en la jurisdicción local como en la federal. Incluso, Olivera Mariani fue acusado criminalmente por hechos relacionados a los negocios que sostuvo con el Departamento de Salud. Ante las imputaciones que se hicieron sobre los contratos, la Oficina del Contralor realizó varias auditorías. Eventualmente, mediante una transacción suscrita en agosto de 1992 por el Departamento de Salud, la AFASS, el

Departamento de Justicia, Olivera Mariani, su esposa y HMCA, representada por el querellado, las partes acordaron la desestimación con perjuicio de las demandas y contrademandas pendientes, así como el sobreseimiento de los procedimientos criminales instados contra HMCA y Olivera Mariani, a cambio de que el querellado transfiriera al Departamento de Salud la administración y operación de los dos hospitales administrados hasta ese momento por su compañía.

A la luz de estos hechos, debemos determinar si Olivera Mariani violó el Canon 38 del Código de Ética Profesional, *supra*.

## II

Al examinar el recurso de autos partimos de la premisa de que los procedimientos disciplinarios instados ante este Tribunal son independientes de las acciones legales –sean éstas civiles o criminales– que surjan de los mismos hechos que provocaron la querella de conducta profesional. In re de la Texera Barnés, res. 8 de septiembre de 2005, 2005 TSPR 152; In re Deynes Soto, res. 23 de marzo de 2005, 2005 TSPR 40. En particular, debemos recordar que la absolución de un abogado en un proceso criminal instado en su contra – o incluso la culminación de dicho proceso de otro modo igualmente favorable para el letrado– no es impedimento para que evaluemos los mismos hechos que motivaron la acción penal y juzguemos si su conducta estuvo reñida con el Código de Ética Profesional. In re Barreto Ríos, 157

D.P.R. 352 (2002); Trib. Exam. Méd. v. Cañas Rivas, 154 D.P.R. 29 (2001); In re Soto López, 135 D.P.R. 642 (1994); In re Franco Soto, 115 D.P.R. 740 (1984). Ello responde al hecho de que se trata de procedimientos que persiguen objetivos distintos, pues a diferencia del procedimiento criminal, el fin del procedimiento disciplinario no es punitivo, sino proteger al público y a la profesión legal. In re Barreto Ríos, *supra*.

A tono con lo anterior, como es sabido, a diferencia de los casos civiles y penales, el estándar de evidencia requerido en los procedimientos disciplinarios es el de prueba clara, robusta y convincente, no afectada por reglas de exclusión ni a base de conjeturas. Ello es así toda vez que estos casos envuelven el derecho del abogado a ganarse su sustento, lo cual es un derecho fundamental. In re Rodríguez Mercado, res. 15 de septiembre de 2005, 2005 TSPR 144; In re Deynes Soto, *supra*; In re Caratini Alvarado, 153 D.P.R. 575 (2001). De esta forma, para que proceda el sancionar a un miembro de la profesión por alegada conducta contraria al Código de Ética Profesional, el Procurador General deberá demostrar ante este Tribunal que existe prueba clara, robusta y convincente de que se cometieron las violaciones deontológicas imputadas.

Tomando estos preceptos como punto de partida, pasemos a examinar la normativa referente al Canon 38 del Código de Ética Profesional, *supra*.

A

El Canon 38 del Código de Ética Profesional, *supra*, le exige a todo abogado el conducirse en forma digna y honorable, no sólo en el desempeño de su profesión, sino también en el ámbito de su vida privada. Ello, según el propio canon, responde a la confianza depositada en el abogado como miembro de la ilustre profesión legal. In re Barreto Ríos, *supra*; In re Sepúlveda, Casiano, 155 D.P.R. 193 (2001). A tono con lo anterior, hemos resuelto que no existe dicotomía alguna entre la vida cotidiana del abogado y el ejercicio de su profesión. La aplicación del Código de Ética Profesional alcanza tanto la vida profesional como la vida privada de un abogado. In re Sepúlveda, Casiano, *supra*; In re Bryan, Vargas, 150 D.P.R. 1 (2000). Por tanto, este Tribunal, dado su poder inherente sobre la profesión de la abogacía, puede sancionar a un miembro de la clase togada por conducta relacionada con su vida personal que se desvíe de los principios establecidos en el mencionado Código.

Ahora bien, no todo tipo de actuación privada de un abogado amerita nuestra intervención, sino aquella que afecte sus cualidades morales o lo haga indigno de pertenecer al foro. In re Sepúlveda, Casiano, *supra*; Colegio de Abogados de P.R. v. Barney, 109 D.P.R. 845 (1980).

El Canon 38 de Ética Profesional, *supra*, también dispone que todo abogado debe "esforzarse, al máximo de su

capacidad, en la exaltación del honor y dignidad de su profesión, aunque el así hacerlo conlleve sacrificios personales y debe evitar hasta la apariencia de conducta profesional impropia". Reiteradamente, al interpretar la disposición anterior, hemos expresado que cada abogado es un espejo en el cual se refleja la imagen de la profesión, por lo que debe actuar, tanto en su vida profesional como en su vida privada, con limpieza, lealtad y el más escrupuloso sentido de responsabilidad. In re Quiñones Ayala, res. 30 de junio de 2005, 2005 TSPR 99; In re Barreto Ríos, *supra*; In re Sepúlveda, Casiano, *supra*; In re Silvagnoli Collazo, 154 D.P.R. 533 (2001); In re Coll Pujols*,* 102 D.P.R. 313 (1974).

Asimismo, hemos aclarado que los miembros de la profesión jurídica, por ser oficiales del Tribunal, ostentan una posición revestida de alto interés público. In re Pujol, res. 19 de junio de 2007, 2007 TSPR 129; In re Meléndez La Fontaine, res. 9 de febrero de 2006, 2006 TSPR 22. De este modo, la finalidad de los Cánones de Ética Profesional es promover el desempeño profesional y personal del abogado a tono con los más altos principios de conducta decorosa, lo que redunda en beneficio de la profesión, de la ciudadanía y de las instituciones de justicia del país. In re Izquierdo Stella, 154 D.P.R. 732 (2001). Particularmente, en el contexto del Canon 38 de Ética Profesional, *supra*, hemos expresado que éste "es una convocatoria a un desempeño que no sólo debe ceñirse a las

pautas éticas mínimas sino que debe ser reflejo del más alto calibre de excelencia humana". In re Sepúlveda, Casiano, *supra*; In re Nogueras Cartagena, 150 D.P.R. 667 (2000).

Conforme a lo anterior, es norma establecida que todo abogado tiene el deber de evitar hasta la apariencia de conducta impropia. La mera apariencia de conducta impropia puede resultar muy dañina al respeto de la ciudadanía por sus instituciones de justicia y a la confianza que los clientes depositan en sus abogados. Además, la apariencia de conducta impropia puede ser tan nociva sobre la imagen y confianza que tiene la ciudadanía por su gobierno, como la verdadera impropiedad ética. In re Sepúlveda Girón, 155 D.P.R. 345 (2001); In re Ortiz Brunet, 152 D.P.R. 542 (2000); In re Nogueras Cartagena, *supra*; In re Ríos Lugo, 119 D.P.R. 568 (1987); In re Rojas Lugo, 114 D.P.R. 687 (1983). Así, todo abogado debe cuidarse de que sus actuaciones no den margen a la más leve sospecha de impropiedad. In re Rivera Vicente, res. 30 de octubre de 2007, 2007 TSPR 189; In re Bonilla Rodríguez, 154 D.P.R. 684 (2001).

Recientemente, en In re Gordon, res. 18 de mayo de 2007, 2007 TSPR 108, sostuvimos que la prohibición contra la apariencia de conducta impropia es un componente esencial del sistema de responsabilidad profesional. Allí aclaramos que el Canon 38 opera *ex proprio vigore*, por lo que cuando un abogado actúa en violación del mismo ello

amerita nuestra intervención disciplinaria. En ese caso reafirmamos, además, lo resuelto en In re Sepúlveda Girón, *supra*, a los efectos de que la apariencia de conducta impropia tiene que sostenerse sobre la impresión que se le da al público de la violación efectiva de alguno de los Cánones de Ética Profesional.

Expuesto el derecho aplicable y a la luz del estándar de evidencia que se exige en estos casos, evaluemos si quedó probado que Olivera Mariani incurrió en la falta imputada.

### III

Según surge del récord, Olivera Mariani era el presidente y único accionista de HMCA. La conducta antiética que aquí se le imputa se relaciona únicamente con las negociaciones que, en tal calidad, éste llevó a cabo con el Departamento de Salud para la obtención de un contrato con esa agencia y para el financiamiento del negocio. Específicamente, la querella presentada contra Olivera Mariani alega que éste "pudo haber violentado" el Canon 38 en el transcurso de dichos acontecimientos. Sin embargo, luego de un cuidadoso estudio del extenso expediente que tenemos ante nuestra consideración, no hemos hallado prueba clara, robusta y convincente que nos lleve a concluir que el querellado incurrió en conducta contraria a la normativa ética vigente.

No existe controversia en torno a que las negociaciones para la aprobación de la Enmienda H, así como

para el financiamiento requerido como parte de la misma, fueron unas de naturaleza altamente compleja. Ante tal circunstancia, el querellado no sólo estuvo asesorado de forma independiente por el Lcdo. Trías Monge, sino que también condicionó la participación de HMCA en el negocio a que el Departamento de Justicia aprobara el mismo. Esto, según indicamos, dio lugar a que el Secretario de Justicia emitiera una opinión en la que aprobó la transacción. También, se llevó a cabo una reunión en la cual participaron, además del querellado y su asesor, el propio Secretario de Justicia, el Subsecretario de Justicia, el Secretario Auxiliar de Asesoramiento, el Secretario de Salud y el asesor legal de éste. En dicha reunión se discutieron los pormenores de la transacción, sin que se expresara objeción alguna de parte de los titulares del Departamento de Justicia ni del Departamento de Salud. De los hechos se desprende claramente que tanto el Departamento de Salud como el Departamento de Justicia participaron activamente en este proceso y prestaron su anuencia al negocio con la corporación del querellado.

Ahora bien, en su queja la Contralor Colón Carlo alegó que Olivera Mariani incurrió en falsas representaciones al utilizar documentos inexistentes para obtener el financiamiento que necesitaba su compañía como parte de la contratación. Para ello, adujo que durante los trámites del financiamiento el querellado se lucró al utilizar la Enmienda H que originalmente fue suscrita por las partes y

que extendía la vigencia del contrato original hasta 1997, a pesar de que la misma había sido rescindida y sustituida por otra cuya vigencia expiraba en 1992. No obstante las referidas imputaciones de Colón Carlo, lo cierto es que no contamos con evidencia clara, robusta y convincente para ratificar esta aseveración.

Según explicamos anteriormente y como lo estipularon las partes en su escrito ante el Comisionado Especial, luego de la aprobación de la Enmienda H HMCA contempló sustituirla por una que no alterara la vigencia del contrato original suscrito con el Departamento de Salud para así atemperarla a los señalamientos del Lcdo. Saldaña. Sin embargo, de acuerdo a las mismas estipulaciones de las partes, aun cuando el Secretario de Salud llegó a firmar los documentos correspondientes para efectuar el cambio propuesto, tras una serie de negociaciones, HMCA y el Departamento de Salud decidieron dejar inalterada la enmienda originalmente suscrita por ellos. Al parecer, la duración del acuerdo hasta el 1997 era un elemento importante para que a HMCA le fuera viable cumplir con sus obligaciones contractuales de administrar y operar los mencionados hospitales de Carolina y Fajardo. De esta manera, no se probó que hubiera subsistido una segunda enmienda sustitutiva de la Enmienda H, por lo que de acuerdo a la evidencia contenida en nuestro expediente, la documentación utilizada por el querellado estaba vigente y era vinculante para las partes contratantes. De hecho,

según indicamos anteriormente, durante uno de los litigios sostenidos entre la Oficina del Contralor y HMCA, los representantes legales de la propia Oficina del Contralor sometieron la Enmienda H originalmente suscrita entre las partes como parte de los documentos de ese caso, por lo que representaron que dicho acuerdo era válido.

Finalmente, debemos notar que, como propietario de HMCA, el querellado también evitó la apariencia de impropiedad al rescindir el primer contrato de cesión a favor de la entidad financiera Pru-Bache. Como explicamos anteriormente, esta primera cesión no sujetaba la obligación de pago del Departamento de Salud y de la AFASS frente a Pru-Bache al cumplimiento por HMCA, por lo que la entidad financiera podría recibir el pago aunque HMCA no prestara los servicios pactados. Acogiendo la recomendación del Lcdo. Saldaña, este acuerdo se sustituyó por otro que comprometía al Departamento de Salud y a la AFASS frente a HMCA solamente.

De un análisis de los documentos que obran en el expediente del caso de autos y de los hechos estipulados por las partes y contenidos en el Informe del Comisionado Especial Hon. Ángel Rossy García, se desprende que el Procurador General no contó con evidencia suficiente para demostrar de forma clara, robusta y convincente que Olivera Mariani incurrió en conducta impropia o que aparentara impropiedad. De hecho, según surge del propio Informe del Comisionado Especial, durante el procedimiento

disciplinario el Procurador General sostuvo que se encontraba ante un proceso con una total "ausencia de evidencia que sugiera o demuestre conducta intencional, impropia o deshonrosa del querellado mientras realizaba gestiones privadas, no como abogado, que lo hagan indigno de pertenecer al foro". En estas circunstancias, debemos dar por concluido este procedimiento disciplinario, cuyo origen se remonta a la década del 1980.

IV

Por los fundamentos que anteceden, resolvemos que el Lcdo. Olivera Mariani no incurrió en violación al Canon 38 del Código de Ética Profesional, *supra*. En consecuencia, desestimamos la querella presentada en su contra y ordenamos el archivo de ésta.

Se dictará Sentencia de conformidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

In re:

Max Olivera Mariani                    CP-2002-3

Sala Especial Integrada por el Juez Presidente señor Hernández Denton, el Juez Asociado señor Rivera Pérez y la Juez Asociada señora Fiol Matta

SENTENCIA

San Juan, Puerto Rico, a 3 de abril de 2008.

Por los fundamentos expuestos en la Opinión Per Curiam que antecede, la cual se hace formar parte de la presente Sentencia, resolvemos que el licenciado Olivera Mariani no incurrió en violación al Canon 38 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX. En consecuencia, desestimamos la querella presentada en su contra y ordenamos el archivo de ésta.

Lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo